517 N.W.2d 895 (1994)
In re Access to Law Enforcement Records Relating to the Arrest of Peter Daniel QUINN on November 10, 1992.
Nos. C5-92-2526, C0-92-2529, C4-93-132, C6-93-133 and C8-93-134.
Supreme Court of Minnesota.
June 17, 1994.
*896 Paul R. Hannah, Laurie R. Zenner, Hannah & Zenner, St. Paul, for Pioneer Press.
John P. Borger, Thomas S. Schroeder, Faegre & Benson, Minneapolis, for Star Tribune.
Joseph M. Crosby, Steven T. Grimshaw, Crosby & Grimshaw, Minneapolis, for Jane Doe.
Ronald I. Meshbesher, James H. Gilbert, John P. Sheehy, Jack S. Nordby, Meshbesher & Spence, Mpls., for A.B., C.D. & E.F.
Michael J. Colich, Michael J. Colich & Assoc., Mpls., for Peter Quinn.
Arthur Katzman, Hennepin County Attys. Office, Minneapolis, for Don Omodt.
William F. Klumpp, Jr., Asst. Atty. Gen., St. Paul, for BCA.
Sandra H. Johnson, Associate City Atty., City of Bloomington, Bloomington, for amicus curiae City of Bloomington.
Wilbur W. Fluegel, Sieben, Grose, Von Holtum, McCoy & Carey, Ltd., Minneapolis, for amicus curiae MN Trial Lawyers Ass'n.
Heard, considered and decided by the court en banc.

OPINION
COYNE, Justice.
Reversing the decision of the court of appeals in In re Quinn, 503 N.W.2d 480 (Minn. App.1993), we hold that the district court erred in ordering the expungement and sealing of law enforcement records relating to an investigation into a complaint made early on the morning of November 10, 1992, by a 19-year-old woman that she had just been raped by a professional hockey player in a Bloomington hotel room.
Peter Daniel Quinn was a hockey player for the Minnesota North Stars. Early in his career, he had played with the Pittsburgh Penguins. On the evening in question, Quinn and three of his former Pittsburgh teammates  Mario Lemieux, Rick Tocchet, and Bob Errey  who were in town to play the North Stars, went to Hooter's, a bar at the Mall of America in Bloomington. There they met the complainant, "Jane Doe," and two of her friends, one of whom was working as a waitress at the bar. When the bar closed, the three women accompanied the men to the nearby Marriott Hotel, where the Pittsburgh players were staying.
It is undisputed that Lemieux had consensual intercourse with one of the women in room number 1001 and that Quinn contemporaneously *897 had intercourse with the complainant, Doe, in the same room. What is disputed is whether Quinn's penetration of Doe was with her consent or was forced. Doe and her friends told police that Quinn made sexual advances toward her and that, even though she told Quinn she did not want to have intercourse with him, he continued his advances and forcibly penetrated her. Lemieux then allegedly called Quinn away from Doe momentarily, and Doe and the other woman who was still in the room tried to leave. However, according to the women, Quinn returned and, this time wearing a condom, again penetrated Doe. Doe then crawled out of the room into the hallway, where she eventually vomited. Her friend had to knock on the door in order to retrieve some of Doe's clothes. The friend stated that Lemieux answered the door and gave her the clothes, but that in the meantime the players had soaked the clothes in beer. Lemieux and Quinn also allegedly called the women "fucking bitches" and, concerned that the women might cause "a scene" in the hallway, threatened to call security if the women did not leave.
After going to the home of one of her friends, Doe went to a local hospital for a sexual assault examination and called police. The officer who questioned her noted a bruise or scratch on her left shoulder and another mark on her upper back.
Bloomington police commenced an investigation that included arresting Quinn, executing a search warrant at the hotel, and taking statements from the witnesses, including the three Pittsburgh Penguin players. The Bloomington Police Chief believed that a rape had occurred and urged prosecution. The Hennepin County Attorney, however, decided not to prosecute Quinn. The decision not to prosecute was announced two weeks after the incident. The North Stars fired Quinn for violating the team's curfew on the night in question.
Quinn and the other three hockey players, Lemieux, Tocchet and Errey, quickly obtained a temporary restraining order barring the City of Bloomington from releasing any of the information in the police files to the public. The district court gave Quinn five days to move for expungement. The three others asked that the records be sealed.[1] A number of parties moved to intervene: the Minneapolis Star-Tribune and the St. Paul Pioneer Press, who want to see the files; the female witnesses, who want their names stricken from any papers in the file; and Jane Doe, who wants to see the file because she is considering filing a civil suit for damages.
After a hearing, the district court ordered, inter alia, that Quinn's arrest record be expunged and the investigative file sealed. The court denied Doe's request and the newspapers' requests to see the file.
Both the trial court and the court of appeals relied heavily on this court's decision in State v. C.A., 304 N.W.2d 353 (Minn.1981), in concluding that the trial court had "inherent authority" to protect Quinn and the other men from harm that might be caused by the release of the information. See Quinn, 503 N.W.2d at 483-84.
It is true that State v. C.A. contains expansive language concerning the scope of the judiciary's inherent authority to order expungement of investigative and arrest records even where no claim is made that the maintenance or dissemination of the records would violate the constitutional rights of the subject of the investigation and even where the records are not court records. However, this court also said in C.A. that exercise of inherent authority extends only to "unique judicial functions," that courts "must proceed cautiously" in relying on the doctrine of inherent authority and must respect the *898 "equally unique authority of the executive and legislative branches." 304 N.W.2d at 358-59. Moreover, there are present in this case factors not present in C.A.: (a) an aggrieved person who wants to see the file because she is contemplating filing a civil suit and (b) aggrieved newspapers who claim a protectable interest in the information.[2]
With this in mind, we proceed to an examination of the relevant provisions of the Minnesota Government Data Practices Act:
13.01 GOVERNMENT DATA.
* * * * * *
Subd. 3. Scope. This chapter regulates * * * access to government data in * * * political subdivisions. It establishes a presumption that government data are public and are accessible by the public for both inspection and copying unless there is federal law, a state statute, or a temporary classification of data that provides that certain data are not public.
* * * * * *
13.03 ACCESS TO GOVERNMENT DATA.
Subdivision 1. Public data. All government data collected * * * by a * * * political subdivision * * * shall be public unless classified by statute, or temporary classification * * *, or federal law, as nonpublic or protected nonpublic, or with respect to data on individuals, as private or confidential.
* * * * * *
Subd. 3. Request for access to data. Upon request to a responsible authority or designee, a person shall be permitted to inspect and copy public government data at reasonable times and places * * *.
* * * * * *
13.82 COMPREHENSIVE LAW ENFORCEMENT DATA.
Subdivision 1. Application. This section shall apply to * * * municipal police departments * * *.
Subd. 2. Arrest data. The following data created or collected by law enforcement agencies which documents any actions taken by them to * * * arrest * * * an adult individual * * * shall be public at all times in the originating agency:
(a) Time, date and place of the action;
* * * * * *
(e) The charge, arrest or search warrants, or other legal basis for the action;
* * * * * *
(j) The name, age, sex and last known address of an adult person * * * arrested * * *;
* * * * * *
(l) The manner in which the agencies received the information that led to the arrest and the names of individuals who supplied the information unless the identities of those individuals qualify for protection under subdivision 10;
* * * * * *
Subd. 5. Data collection. Except for the data defined in subdivisions 2, 3 and 4, investigative data collected or created by a law enforcement agency in order to prepare a case against a person * * * for the commission of a crime or civil wrong is confidential or protected nonpublic while the investigation is active. Inactive investigative data is public unless the release of the data would jeopardize another ongoing investigation or would reveal the identity of individuals protected under subdivision 10. * * * An investigation becomes inactive upon the occurrence of any of the following events:
(a) a decision by the * * * appropriate prosecutorial authority not to pursue the case;
* * * * * *
Subd. 6. Access to data for crime victims. The prosecuting authority shall release investigative data collected by a law *899 enforcement agency to the victim of a criminal act or the victim's legal representative upon written request unless the prosecuting authority reasonably believes:
(a) That the release of that data will interfere with the investigation; or
(b) That the request is prompted by a desire on the part of the requester to engage in unlawful activities.
* * * * * *
Subd. 10. Protection of identities. A law enforcement agency * * * may withhold public access to data on individuals to protect the identity of individuals in the following circumstances:
* * * * * *
(b) when access to the data would reveal the identity of a victim of criminal sexual conduct * * *;
* * * * * *
(d) when access to the data would reveal the identity of a victim of or witness to a crime if the victim or witness specifically requests not to be identified publicly, and the agency reasonably determines that revealing the identity of the victim or witness would threaten the personal safety or property of the individual;
* * * * * *
Minn.Stat. §§ 13.01, 13.03, 13.82 (1992).
We address first the issue of public/press access under the Act. In our opinion, the terms of the Act require release of the file upon a request made to the Bloomington Police Department. The investigation is no longer active, since the Hennepin County Attorney has rejected the recommendation of the Bloomington Police Chief and has chosen not to prosecute. Inactive investigative data, in the words of section 13.82, subdivision 5, "is public unless the release of the data would jeopardize another ongoing investigation or would reveal the identity of individuals protected under subdivision 10." The release of the data clearly would not jeopardize another ongoing investigation, because there is no evidence that there is another ongoing investigation. Moreover, the release of the data would not reveal the identity of individuals protected under subdivision 10. Quinn and his friends who are witnesses have not clearly articulated why subdivision 10 applies, but it appears that they are arguing that their reputations as hockey stars constitute "property" within the meaning of the subdivision and, presumably because the release of the file would reveal unflattering facts, their property interest in their reputations would be harmed by release of the file. We concluded, however, in Demers v. City of Minneapolis, 468 N.W.2d 71, 74 (Minn.1991), that subdivision 10's "threat" exception applies "only in cases where the person might suffer serious harm or retaliation." The Bloomington Police Department has determined that no such threat exists here. Moreover, as the Star-Tribune argues in its brief on appeal, if "emotional distress constitutes a `threat to personal safety' * * * under the statute, then the exception * * * would swallow the rule" because one is necessarily distressed by one's association with conduct of the sort here alleged. Similarly, if possible harm to one's reputation constitutes a threat to one's property under the statute, the exception would again swallow much of the rule because possible harm to reputation often accompanies release of information of the sort involved in this case.
The men also assert that releasing the files will discourage witnesses from cooperating with the police in future cases. Although we do not believe that this is true, this is a policy argument that is better addressed to the legislature.
Jane Doe's right of access is even greater than that of the public/press. She is a member of the public and has the same right as any other member of the public to scrutinize inactive police files. But, under section 13.82, subdivision 6, as the victim of a crime, she has a greater right of access than the public/press. The question of victim access to investigative data was addressed as follows in Donald A. Gemberling & Gary A. Weissman, Data Privacy: Everything You Wanted to Know About the Minnesota Government Data Practices Act  From "A" to "Z", 8 Wm.Mitch.L.Rev. 573, 646 (1982):
The problem of victim access to active investigative data is particularly acute *900 when the victim, or his or her attorney or other representative, may want and even need access to the investigative data to begin assessing or preparing a civil case against the alleged perpetrator. While there may be insufficient investigative data to criminally charge and convict the alleged perpetrator, the difference in the degree of proof in a civil case may make the investigative data or evidence developed from it legally sufficient, or at least very helpful, in preparing the civil case.
To deal with victim access to investigative data, the legislature, in 1979, amended [the Data Practices Act] to provide that upon written request to the appropriate prosecutorial authority in the jurisdiction which is maintaining the active investigative data, the prosecuting authority "shall release investigative data collected by a law enforcement agency to the victim of a criminal act or his legal representative." The prosecuting authority is not required to provide victims or their legal representatives access to active investigative data if "the prosecuting authority reasonably believes: (a) That the release of that data will interfere with the investigation; or (b) That the request is prompted by a desire on the part of the requester to engage in unlawful activities."
Under the statute, the victim has access to active investigative data still in the hands of the prosecutor's office unless release of the data to the victim will hinder the investigation or further an intent to use it for unlawful purposes.[3]
In summary, Doe's right of access under section 13.82, subdivision 6, commenced immediately, continued throughout the period that the investigation was active, and continued after the investigation became inactive; moreover, as a member of the public, she also had the same right of access as the public/press under section 13.82, subdivision 5, once the investigation became inactive.
Finally, we reject the contention that expungement and sealing was justified in this case to protect a "unique judicial function" and that therefore expungement and sealing was justified notwithstanding the applicability of the statute. As this court said in State v. Carriere, 290 N.W.2d 618, 620 n. 3 (Minn. 1980), the prosecutor is an executive officer or official. The same is true of police officers. The court, of course, has some control over prosecutors and police officers stemming from the fact that crimes can only be prosecuted in courts and the fact that prosecutors are officers of the court. But courts, for example, generally cannot tell a prosecutor whether or not to charge an individual with a crime and cannot tell a prosecutor to accept an offer by a defendant to plead guilty to a lesser offense than charged if the prosecutor can show that the state can withstand a motion to dismiss the charge. Id. Similarly, while the court can indirectly control a prosecutor's out-of-court conduct through the disciplinary rules and through the exclusionary sanction, the court generally cannot directly control how prosecutors run their offices or how police departments investigate crimes. If the records involved were judicial records and if the judiciary had some legitimate interest in expunging or sealing of the records, then the doctrine of inherent judicial authority might require us to resolve a conflict. As we see it, however, there is no judicial interest in the expunging or sealing of the records in question and there is no conflict.
The decision of the district court, affirmed by the court of appeals, is therefore reversed in its entirety.
Reversed.
NOTES
[1] In their motion, the three men alleged that they were assured that their statements would remain confidential, although the police officer who interviewed them denied any such promises were made. The players alleged that their "name[s] and identity[ies] have commercial value" and that "release of information from the investigative file * * * would threaten [these] property rights * * *, including [their] proprietary interest in * * * public personality and identity." The players claim that, "due to media coverage," they suffered emotional distress. In addition, one of the men stated in his affidavit that "unknown persons have trespassed * * * about [his] home" and harassed him.
[2] In State v. C.A., 304 N.W.2d 353 (Minn.1981), this court said, "Had an order not to disclose been granted by the trial judge in this case we would not have reversed, at least in the absence of objection by an aggrieved person claiming a protectable interest in the information, such as a newspaper reporter." Id. at 360. Here, the expungement/sealing issues arise not in the absence of objection but over the objection of aggrieved parties.
[3] The trial court apparently believed that Doe had no rights under section 13.82, subdivision 6, because the prosecutor had decided not to prosecute and therefore Doe was not a crime victim. We believe that access under subdivision 6 to active investigative data applies both to victims and alleged victims, a construction confirmed by a 1993 clarifying amendment. The statute now reads: "shall release * * * to the victim of a criminal act or alleged criminal act." Section 13.82, subdivision 6, as amended by Act of May 24, 1993, ch. 351, section 17, 1993 Minn.Laws 2488.