**STATE of Minnesota, Appellant,**

v.

**M.D.T., Respondent.**

No. A11–1285.

Supreme Court of Minnesota.

May 22, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; and Kathleen A. Kusz, Nobles County Attorney, Kimberly S. Pehrson, Travis J. Smith, Assistant Nobles County

Attorneys, Worthington, MN, for appellant.

Daniel A. Birkholz, Jacob Birkholz, Birkholz Law, LLC, Saint James, MN, for respondent.

David P. Swenson, Katherine S. Barrett Wiik, Adam Welle, Robins, Kaplan, Miller & Ciresi LLP, and Emily Baxter, Council on Crime and Justice, Minneapolis, MN, for amici curiae Council on Crime and Justice, Legal Rights Center, Minnesota Association of Criminal Defense Lawyers, Minnesota Assistance Council for Veterans, Minnesota Legal Services Coalition, Minnesota State Public Defender, Minnesota Restorative Services Coalition, National Alliance on Mental Illness of Minnesota, Regional Native Public Defense Corporation, Volunteer Lawyers Network, and William Mitchell Law Clinic.

## OPINION

GILDEA, Chief Justice.

This case arises from respondent M.D.T.'s petition to expunge records relating to her aggravated forgery conviction. The district court granted M.D.T.'s request and ordered "[a]ll official records" to "be sealed and their existence . . . be disclosed only by court order." The court of appeals affirmed the district court. *State v. M.D.T.*, 815 N.W.2d 628 (Minn.App. 2012). Because we conclude that the district court did not have inherent authority to expunge M.D.T.'s records held in the executive branch, we reverse that part of the court of appeals' decision.

On February 7, 2006, police arrested M.D.T. for presenting an altered prescription to a Shopko pharmacy. M.D.T. presented a prescription for Robitussin with codeine—a controlled substance—that was altered to increase the prescribed amount from 200 to 400 milliliters. In her statement to police, M.D.T. admitted that she had altered the prescription and said that she did so because she "did not have enough money to go back to the doctor if the medicine did not work."

The State subsequently charged M.D.T. with two counts of aggravated forgery in violation of Minn.Stat. § 609.625, subd. 1(1) (2012) ("making or altering"), and Minn.Stat. § 609.625, subds. 1(1), 3 (2012) ("uttering or possessing"), and one count of controlled substance crime in the fifth degree in violation of Minn.Stat. § 152.025, subds. 2(2)(i), 3(a) (2008) ("procurement by fraud"). M.D.T. entered an *Alford* plea[1] to the aggravated forgery by "uttering or possessing" count. In January 2007, the district court convicted M.D.T. of aggravated forgery pursuant to her plea, and stayed the imposition of M.D.T.'s sentence subject to several conditions. The conditions included that M.D.T. complete three years of supervised probation and pay an $879 fine. In February 2008, M.D.T. was discharged early from probation and $600 of her fine was forgiven.

Approximately seven months after she was discharged from probation, M.D.T. filed a petition for expungement of her criminal record. M.D.T. sought expungement because she wanted to "move on with [her] life," "go to college," and "start [a] career." M.D.T. claimed her record precluded her from following "through with [her] career in business management in accounting." The district court denied M.D.T.'s petition.

---

**1.** In *North Carolina v. Alford*, 400 U.S. 25, 38, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), the United States Supreme Court held that in some circumstances, a court may constitutionally accept a defendant's guilty plea even though the defendant maintains his or her innocence.

On January 31, 2011, M.D.T. filed a second petition for expungement. M.D.T. sought expungement because her conviction was impeding her "lifelong dream of becoming an accountant." M.D.T. argued she was qualified for expungement because she had been rehabilitated and the benefit of expunging her record outweighed any disadvantage to the public and the court. The petition detailed M.D.T.'s employment history, career plans, personal history, and education. The petition also noted that M.D.T. had no convictions other than the aggravated forgery conviction.

In addition to M.D.T.'s petition and the materials she submitted, the district court received a letter from the Director of Rock Nobles Community Corrections, indicating that the agency was not "opposed to the expungement of this case." The Nobles County Attorney, however, opposed the petition.

The district court granted M.D.T.'s motion to expunge her criminal records. The court found "clear and convincing evidence that sealing [M.D.T.'s] record would yield a benefit ... commensurate with the disadvantages to the public." The court noted that precedent regarding expungement of executive branch records is "unclear," and, relying on three unpublished cases from the court of appeals, utilized a "more expansive view of the Court's inherent judicial authority." Citing *State v. S.L.H.*, 755 N.W.2d 271 (Minn.2008), and *State v. C.A.*, 304 N.W.2d 353 (Minn.1981), the district court reasoned that M.D.T.'s "one-time mistake of altering a minor cold medicine prescription," in light of her rehabilitative efforts, did not justify hindering M.D.T.'s employment options for 15 years. As such, the court sealed "[a]ll official records held by" the Nobles County District Court, Sheriff, and County Attorney; Worthington City Police Department and City Attorney; Minnesota Attorney General's Office; Minnesota Department of Corrections; Probation/Court Services Department; and the Bureau of Criminal Apprehension ("BCA").

The State appealed, and the court of appeals affirmed. *M.D.T.*, 815 N.W.2d 628. The court of appeals held that the district court had the inherent authority to expunge M.D.T.'s records. *Id.* at 639. The court also held that the district court did not abuse its discretion by ordering the expungement of M.D.T.'s criminal records "generated and held by the judicial branch and the sealing of [the] records maintained by the executive branch." *Id.* The court concluded that expungement of M.D.T.'s records implicated the judiciary's fundamental function of maintaining and disseminating criminal records that were sealed by the judicial branch. *Id.* We granted the State's petition for review.

We review the lower court's decision on whether to expunge criminal records "under an abuse of discretion standard." *State v. Ambaye*, 616 N.W.2d 256, 261 (Minn.2000). But the question presented in this case—whether the district court exceeded the scope of its inherent authority to expunge criminal records—is a question of law. *State v. Chauvin*, 723 N.W.2d 20, 23 (Minn.2006). We review questions of law de novo. *Modrow v. JP Foodservice, Inc.*, 656 N.W.2d 389, 393 (Minn.2003).

I.

There are two bases for expungement of criminal records in Minnesota: Minn.Stat. ch. 609A (2012) and the judiciary's inherent authority. *S.L.H.*, 755 N.W.2d at 274. M.D.T. does not claim she is entitled to statutory expungement; she argues instead that the district court possessed inherent authority to expunge her criminal records. Accordingly, the only question in this case involves inherent authority.

The parties dispute whether the district court exceeded the scope of its inherent authority when it expunged "all official records" of M.D.T.'s conviction.[2] The State argues that the district court exceeded its inherent authority when it expunged M.D.T.'s criminal records held in the executive branch. M.D.T. contends that, because the district court expunged her records held by the judicial branch, the district court properly exercised its inherent authority by expunging executive branch records to "effectuate a meaningful remedy." The amici argue that public policy weighs in favor of allowing courts to provide a "complete expungement remedy in appropriate circumstances."

 The judiciary's inherent power "governs that which is essential to the existence, dignity, and function of a court because it is a court." *In re Clerk of Lyon Cnty. Courts' Comp.*, 308 Minn. 172, 176, 241 N.W.2d 781, 784 (1976). The origin of judicial power in Minnesota is our state constitution. Minn. Const. art. VI, § 1 (vesting "[t]he judicial power of the state" in the "supreme court, a court of appeals, if established by the legislature, a district court and such other courts … as the legislature may establish"). But " 'when the court came into existence it came with inherent powers.' " *State by Archabal v. Cnty. of Hennepin*, 505 N.W.2d 294, 298 n. 6 (Minn.1993) (quoting *In re Greathouse*, 189 Minn. 51, 55, 248 N.W. 735, 737 (1933)). The inherent power derives from the judiciary's "right to protect itself, to

enable it to administer justice whether any previous form of remedy has been granted or not." *In re Greathouse*, 189 Minn. at 55, 248 N.W. at 737.

 In order to determine whether inherent authority exists, we ask "whether the relief requested by the court or aggrieved party is necessary to the performance of the judicial function as contemplated in our state constitution." *Clerk of Lyon Cnty. Courts' Comp.*, 308 Minn. at 181, 241 N.W.2d at 786. We apply that test "with due consideration" for the other branches of government and do not rely on inherent authority to serve the "relative needs or … wants" of the judicial branch. *Id.* at 181–82, 241 N.W.2d at 986. We have also recognized that courts must be mindful not to "use judicial authority to enforce or restrain acts which lie within the executive and legislative jurisdictions." *Granada Indep. Sch. Dist. No. 455 v. Mattheis*, 284 Minn. 174, 180, 170 N.W.2d 88, 91 (1969). And when a question arises regarding the scope of the judiciary's inherent authority, courts must "resolve all reasonable doubts in favor of a co-ordinate branch." *Gollnik v. Mengel*, 112 Minn. 349, 350–51, 128 N.W. 292, 292 (1910).

In the area of expungement, we have held that the judiciary may use its inherent authority to expunge criminal records where "the petitioner's constitutional rights may be seriously infringed by retention of his records." *In re R.L.F.*, 256 N.W.2d 803, 808 (Minn.1977). M.D.T.

---

**2.** For the purpose of this opinion, "all official records" include three types of records: (1) records created by the executive branch and held in the executive branch; (2) records created by the judicial branch and held in the executive branch; and (3) records held in the judicial branch. The district court ordered all three types of records expunged and the court of appeals affirmed. *M.D.T.*, 815 N.W.2d at 632, 639. On appeal to this court, the State challenges only the expungement of the first

two types. Accordingly, we do not address in this opinion the scope of the district court's inherent authority to expunge records held in the judicial branch (type 3). We address the judiciary's inherent authority to expunge the other two types: records created by and held in the executive branch (type 1); and records created by the judicial branch and held in the executive branch (type 2). We refer to these two types of records as "records held in the executive branch."

does not argue that expungement is needed to protect her constitutional rights.

We have also recognized that inherent authority may extend to expungement of criminal records when expungement is necessary to " 'the performance of judicial functions.' " *Barlow v. Comm'r of Pub. Safety*, 365 N.W.2d 232, 234 (Minn.1985) (quoting *C.A.*, 304 N.W.2d at 358). We first recognized this potential in *C.A.*, 304 N.W.2d at 358–59.

M.D.T. argues that the district court had inherent authority to expunge her criminal records based on our dicta in *C.A.* The district court likewise cited *C.A.* to support its conclusion that its inherent authority reached into the executive branch. In *C.A.*, we recognized in dicta that the judiciary has the inherent authority to expunge criminal records when doing so serves a "unique judicial function[ ]." *Id.* at 358. The unique judicial function at issue in our discussion in *C.A.* was the judiciary's ability to remedy the unfairness to C.A. from the accessibility of his criminal records even after his conviction had been set aside. *See S.L.H.*, 755 N.W.2d at 277 (discussing *C.A.*, 304 N.W.2d at 358–59). In the context of a conviction having been set aside, expungement of the petitioner's records held outside the judiciary could be viewed as "closely tied to the core judicial function of granting full relief ... to the petitioner." [3] *Id.*

M.D.T.'s reliance on *C.A.* to support expungment of her records is misplaced.

The unfairness issue we discussed in *C.A.* is simply not present in this case because M.D.T.'s conviction has not been set aside. To the extent the district court relied on the unfairness analysis in *C.A.* to support its use of inherent authority to expunge M.D.T.'s records held in the executive branch, the court exceeded its authority. Unlike *C.A.*, M.D.T. stands convicted of the offense that is reflected in the records she seeks to expunge. *See S.L.H.*, 755 N.W.2d at 277 ("The unfairness concern at issue in *C.A.* ... is not implicated in the same way in this case because S.L.H. continues to stand convicted of the ... crime. Because S.L.H.'s conviction has not been set aside, the expungement of her criminal records held outside the judicial branch is not necessary to grant her full relief.").

Moreover, even in the context of *C.A.*, where the conviction had been set aside, we still did not order expungement of records held in the executive branch. 304 N.W.2d at 355. Indeed, we have never held that the judiciary's inherent authority to order expungement extends to records held in the executive branch. *See S.L.H.*, 755 N.W.2d at 280; *Ambaye*, 616 N.W.2d at 261; *In re Quinn*, 517 N.W.2d 895, 900 (1994); *Barlow*, 365 N.W.2d at 234–35.

M.D.T. nevertheless argues that expungement of her criminal records held in the executive branch is necessary to the performance of a unique judicial function because the judiciary expunged its own records and so the records held in the

---

**3.** After our decision in *C.A.*, the Legislature recognized the potential for injustice that exists when the judiciary is not able to expunge records held in the executive branch relating to a conviction that has been set aside. The Legislature enacted a statute that grants the judiciary authority to expunge records in this circumstance. Minnesota Statutes § 609A.02, subd. 3 now provides: "A petition may be filed under section 609A.03 to seal all records relating to an arrest, indictment or information, trial, or verdict if the records are not subject to section 299C.11, subdivision 1, paragraph (b), and if all pending actions or proceedings were resolved in favor of the petitioner." The dissent completely ignores this statute when it argues "that expungement in our state is essentially an illusory remedy." That the Legislature could have, as a policy matter, enacted a broader remedy does not make the remedy the Legislature provided illusory.

executive branch must be expunged as well. Specifically, M.D.T. argues that expungement of executive branch records is part of the judicial function to control court records and agents of the court in possession of court records. We said in *C.A.* that the judiciary has inherent authority to control court records. 304 N.W.2d at 361 ("The clerk is subject to the inherent power of the court to control its internal records."). But the authority the judiciary has to control its own records does not give the judiciary inherent authority to reach into the executive branch to control what the executive branch does with records held in that branch, even when those records were created in the judiciary.

 This is so because of our "mandate" that the judiciary "'proceed cautiously'" in relying on "inherent authority." *S.L.H.*, 755 N.W.2d at 278 (quoting *C.A.*, 304 N.W.2d at 359). This caution is rooted in separation of powers concerns. *Id.* And specifically with regard to expungement, we have recognized that the judiciary is not to resort to inherent authority when doing so would not "respect the equally unique authority of" another branch of government. *C.A.*, 304 N.W.2d at 359; *cf. Clerk of Lyon Cnty. Courts' Comp.*, 308 Minn. at 181–82, 241 N.W.2d at 786 ("The test [for determining whether inherent authority exists] must be applied with due consideration for equally important executive and legislative functions."). It is particularly apt in this case for us to adhere to that cautionary approach because of the clear legislative expressions of policy that confirm that M.D.T.s criminal records held in the executive branch are public information.

The first such legislative expression is contained in Minn.Stat. ch. 609A. In this chapter, the Legislature identified the specific circumstances where a court may expunge criminal records held in the executive branch. In chapter 609A, the Legislature provided for the expungement of criminal records for certain controlled substance crimes, Minn.Stat. § 609A.02, subd. 1, certain juvenile offenders prosecuted as adults, Minn.Stat. § 609A.02, subd. 2, and certain criminal cases that do not result in convictions, Minn.Stat. § 609A.02, subd. 3. But the Legislature did not provide for expungement of the criminal records of someone like M.D.T., who stands convicted of aggravated forgery.

The second relevant legislative policy is contained in the Minnesota Government Data Practices Act ("MDPA"), which "establishes a presumption that government data are public." Minn.Stat. § 13.01, subd. 3 (2012). More specifically, "data created or collected by law enforcement agencies which documents any actions taken by them to cite, arrest, incarcerate or otherwise substantially deprive an adult individual of liberty" is to "be public at all times in the originating agency." Minn. Stat. § 13.82, subd. 2 (2012). The MDPA also states that:

> [D]ata created, collected, or maintained by the [BCA] that identify an individual who was convicted of a crime, the offense of which the individual was convicted, associated court disposition and sentence information, controlling agency, and confinement information are public data for 15 years following the discharge of the sentence imposed for the offense.

Minn.Stat. § 13.87, subd. 1(b) (2012). Under section 13.87, subdivision 1(b), records that relate to a defendant's conviction, sentence, and confinement are public for 15 years following the discharge of a defendant's sentence, whether those records are created by the executive branch or the judicial branch. Because 15 years have

not elapsed since the discharge of M.D.T.'s sentence, the Legislature has determined in the MDPA that M.D.T.'s criminal records are public data.[4]

 Recognition of inherent judicial authority to expunge M.D.T.'s criminal records held in the executive branch would effectively override the legislative policy judgments expressed in both of these statutes. We have said, however, that "the exercise of inherent authority must be delineated in such a way as to accommodate those policies where appropriate." *C.A.*, 304 N.W.2d at 359. It is plainly appropriate to recognize and accommodate legislative policy judgments in the context of expungement of criminal records held outside the judiciary. As the California Supreme Court noted, "the difficult task of striking the proper balance between [the] competing concerns" of public access and privacy rights is uniquely suited to the legislative branch. *Loder v. Mun. Court for San Diego Judicial Dist.*, 17 Cal.3d 859, 132 Cal.Rptr. 464, 553 P.2d 624, 636 (1976) (declining to use inherent judicial authority to expunge arrest records). We agree, and our Legislature has struck that balance with respect to M.D.T.'s criminal records held in the executive branch. It is not necessary to the performance of a judicial function to strike the balance differently.[5]

 Finally, M.D.T. relies on the district court's conclusion that the benefit to M.D.T. of expungement of her criminal records outweighs the disadvantages to the public of expungement. Based on this balancing, M.D.T. urges us to uphold the expungement of her records held in the executive branch. In *C.A.*, we articulated the balancing test the district court used. 304 N.W.2d at 358 (noting that "the court must decide whether expungement will

4. The dissent's reliance on the district court's decision to seal, but not destroy, M.D.T.'s records is misplaced. In the MDPA, the Legislature has determined that the records are public, and in the MDPA, in order to gain access to public information, all one need do is request it. *See* Minn.Stat. § 13.03, subd. 3(a) (2012) ("Upon request ... a person shall be permitted to inspect and copy public government data."). To suggest as the dissent does that the judiciary can override that legislative policy judgment and require instead that members of the public prove cause to overcome the judicial sealing of the records is inconsistent with our inherent authority precedent. *See, e.g., In re Quinn*, 517 N.W.2d at 897–98 (recognizing "that courts 'must proceed cautiously' in relying on the doctrine of inherent authority and must respect the 'equally unique authority of the executive and legislative branches.' " (quoting *C.A.*, 304 N.W.2d at 358–59)); *Barlow*, 365 N.W.2d at 234 ("[A]ny exercise of a court's inherent powers to carry out judicial functions must be singularly mindful of the equally unique authority of the legislative and executive branches of government to carry out their constitutional functions."). Indeed, the dissent does not even attempt to explain how its expansive view of inherent judicial authority respects the Legislature's policy judgments.

5. Grounded primarily in dicta from *C.A.*, and inspired by Victor Hugo, the dissent criticizes the county attorney's charging and litigation decisions, and second-guesses policy judgments the Legislature has made. Our precedent permits neither. *See, e.g., State v. Krotzer*, 548 N.W.2d 252, 254 (Minn.1996) ("Under established separation of powers rules, absent evidence of selective or discriminatory prosecutorial intent, or an abuse of prosecutorial discretion, the judiciary is powerless to interfere with the prosecutor's charging authority." (citations omitted)); *In re Welfare of M.L.M.*, 813 N.W.2d 26, 35 (Minn.2012) ("It is not our role to second-guess these [legislative] policy judgments." (citations omitted)). The dissent's unprecedented and boundless extension of inherent judicial authority into the executive branch to seal records that the Legislature has decided are public also runs afoul of our warning that inherent judicial authority does not exist to serve the "relative needs or ... wants" of individual members of the judiciary. *Clerk of Lyon Cnty. Courts' Comp.*, 308 Minn. at 181, 241 N.W.2d at 786.

yield a benefit to the petitioner commensurate with the disadvantages to the public from the elimination of the record and the burden on the court in issuing, enforcing and monitoring an expungement order"). This balancing test, however, is relevant only after the court concludes, as a threshold matter, that expungement is necessary to the performance of a unique judicial function.[6] *Id.* As we have concluded above, expungement of M.D.T.'s records held in the executive branch is not necessary to the performance of a unique judicial function. That conclusion is dispositive, and makes it unnecessary to engage in the balancing test we discussed in *C.A.*

Because expungement of M.D.T's criminal records held in the executive branch is not necessary to the performance of a unique judicial function, we hold that the district court did not have the authority to expunge M.D.T.'s criminal records held in the executive branch.

Reversed in part.

STRAS, J., concurring.

ANDERSON, PAUL H., PAGE, JJ., dissenting.

STRAS, Justice (concurring).

This case raises fundamental questions about the judiciary's authority under the Minnesota Constitution. The narrow question raised by this case is whether district courts may, consistent with the Minnesota Constitution, expunge executive-branch records. The court answers that question with reference to the judiciary's "inherent authority." However, like many of our prior decisions, the court fails to explore the source, if any, of the judicia-

ry's "inherent authority." To put it bluntly: inherent in what?

Even a cursory review of our cases reveals that the phrase "inherent authority" is a misnomer—one devoid of any real meaning. Rather, when discussing "inherent authority," we are really referring to the "judicial power"—the grant of authority to the judicial branch in article VI, section 1 of the Minnesota Constitution. The judicial power clause vests the "judicial power" in "a supreme court, a court of appeals, if established by the legislature, a district court, and such other courts ... as the legislature may establish." Minn. Const. art. VI, § 1. Unlike the United States Constitution, the Minnesota Constitution also contains a freestanding separation of powers clause, which divides the powers of government into "three distinct departments: legislative, executive and judicial." Minn. Const. art. III, § 1. That clause prohibits the "distinct departments" of government from exercising any of the powers "belonging to either of the others except in the instances expressly provided in this [C]onstitution." *Id.; see also In re Application of Senate,* 10 Minn. 78, 81 (Gil. 56) (1865) (explaining that the Minnesota Constitution "prevents an assumption by either department of power not properly belonging to it"). While the separation of powers does "not mean absolute division of our government's function," *Holmberg v. Holmberg,* 588 N.W.2d 720, 723 (Minn. 1999), we have never permitted one branch to exercise the power exclusively assigned to another, *see Quam v. State,* 391 N.W.2d 803, 809 (Minn.1986).

While providing some guidance, the Minnesota Constitution does not describe

---

**6.** In *Ambaye,* we did not address this threshold question of inherent judicial authority as we do in this case. 616 N.W.2d at 261. There, the district court determined, after conducting the balancing discussed in *C.A.*

that expungement was not warranted. *Id.* The only question we reviewed on appeal regarding inherent authority was whether the district court had abused its discretion in applying the balancing test. *Id.*

the "judicial power," other than to tell us where it is vested—the courts—and what it is not—the powers exercised by the legislative and executive branches. However, the phrase "judicial power," unlike "inherent authority," had a widely understood meaning when the residents of the territory of Minnesota ratified the Minnesota Constitution in 1857. The essence of the "[j]udicial power is the power that adjudicates upon the rights of persons or property, and to that end declares, construes and applies the law." *Hunstiger v. Kilian,* 130 Minn. 474, 477, 153 N.W. 869, 870 (1915); *cf. Murray v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 284, 18 How. 272, 15 L.Ed. 372 (1855) (noting in 1856, just 1 year prior to the ratification of the Minnesota Constitution, that the "judicial power" extends to "any matter which, from its nature, is the subject of a suit at the common law, or in equity"). The core of the "judicial power," therefore, is to decide cases. *See Stern v. Marshall,* — U.S. ——, ——, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011) (stating that the United States Constitution assigns to the judiciary the job of resolving " 'the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law' ") (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 86–87 n. 39, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)).

Even within that core, however, the judiciary's power has limits. For example, the "judicial power" extends only to the resolution of actual controversies and does not permit us to render advisory opinions, no matter how important the legal question. *See Seiz v. Citizens Pure Ice Co.,* 207 Minn. 277, 281, 290 N.W. 802, 804 (1940). In fact, the lack of a justiciable controversy deprives courts of subject matter jurisdiction—a prerequisite for the exercise of "judicial power." *Id.; see also*

*Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434, 439 (Minn.1990) (" 'Issues which have no existence other than in the realm of future possibility are purely hypothetical and are not justiciable.' ") (quoting *Lee v. Delmont,* 228 Minn. 101, 110, 36 N.W.2d 530, 537 (1949)). The Minnesota Constitution also imposes certain procedural limitations on the exercise of the "judicial power." For example, the Minnesota Constitution explicitly forbids this court from presiding over jury trials. Minn. Const. art. VI, § 2 (granting this court "appellate jurisdiction," but mandating that "there shall be no trial by jury in the supreme court"); *Prignitz v. Fischer,* 4 Minn. 366, 367 (Gil. 275) (1860) ("Since the adoption of the [Minnesota] [C]onstitution there can be no trial by jury in [the supreme] court."). It is clear, therefore, that the "judicial power" is limited by the traditional understanding of that phrase, as articulated in our justiciability cases, and by the Minnesota Constitution, which prohibits courts from exercising the power belonging to any other department of government and constrains the exercise of "judicial power."

Our cases exercising "inherent authority" are not so circumscribed. We have variously invoked our "inherent authority" to promulgate rules of evidence and procedure, *e.g., State v. McCoy,* 682 N.W.2d 153, 160 (Minn.2004), to strike down statutorily imposed limitations on attorney fees, *Irwin v. Surdyk's Liquor,* 599 N.W.2d 132, 141–42 (Minn.1999), to order public entities in litigation to hold settlement conferences, *State by Archabal v. Cnty. of Hennepin,* 505 N.W.2d 294, 298 (Minn.1993), and to regulate admission to the bar and supervise the conduct of lawyers, *In re Petition for Integration of the Bar of Minn.,* 216 Minn. 195, 198–99, 12 N.W.2d 515, 517–18 (1943). We have even invoked our "inherent authority" to place a fee on all Minne-

sota lawyers to fund the State Public Defender's Office, notwithstanding the fact that the power to tax is vested in the legislative branch by article IV, section 18 of the Minnesota Constitution.[1] *See Order Temporarily Increasing Lawyer Registration Fees*, No. C1–81–1206, Order at 1–3 (Minn. filed Nov. 4, 2009). Finally, we have relied on "our inherent authority to hear an appeal in the interests of justice" over which we would otherwise lack jurisdiction. *See State v. Obeta*, 796 N.W.2d 282, 286–87 (Minn.2011).

We have therefore invoked our "inherent authority" in a "kaleidoscope of circumstances" that defies categorization. *State v. Beecroft*, 813 N.W.2d 814, 867–68 (Minn.2012) (Stras, J., dissenting). And similar to our jurisprudence on the "interests of justice," "the standard for invoking the power cannot be precisely described or defined." *Id.* at 868 (citation omitted) (internal quotation marks omitted). Perhaps the most apt description of "inherent authority," like the "interests of justice," is that it resembles some sort of trump card that courts play when direct constitutional authority is absent.[2] The flaw in such an approach, however, is that it turns the relevant constitutional analysis on its head: rather than determining whether particular actions are *included* within the "judicial power," we ask the converse question of whether any provision of the Minnesota Constitution explicitly *prohibits* those actions. Inverting the constitutional analysis has led to the untethered, freewheeling approach to "inherent authority" that saturates our case law. *See, e.g.*, Adrian Vermeule, *The Judicial Power in the State (and Federal) Courts*, 2000 Sup.Ct. Rev. 357, 360 (2000) (arguing that "state [court] decisions articulate conceptions of judicial authority that sweep beyond any defensible conception of judicial power").

---

1. I correctly observed in my concurrence to a March 2, 2011 order extending the increase in lawyer registration fees that I had "serious doubts about our authority, inherent or otherwise, to order a fee increase for a service that the State of Minnesota is constitutionally obligated to provide to its citizens." *See Order Extending Increase in Lawyer Registration Fees*, No. ADM10–8002, Concurrence at 1 (Minn. filed March 2, 2011) (Stras, J., concurring). Upon reflection, I now believe I was wrong to join the court's order extending the fee increase. At the time, I concluded that "our inherent authority to authorize the fee increase was settled by a majority of this court when we temporarily granted the fee increase in 2009." *Id.* When addressing the proper scope of "judicial power," however, the doctrine of *stare decisis* cannot, and should not, have the same weight. *See Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307, 324 (2000) (Corrigan, J., concurring) ("If a prior decision of this Court reflects an abuse of judicial power at the expense of legislative authority, a failure to recognize and correct that excess, even if done in the name of stare decisis, would perpetuate an unacceptable abuse of judicial power.").

2. To be sure, we have suggested that "[t]he judicial power of this court has its origin in the [Minnesota] [C]onstitution, but when the court came into existence it came with inherent powers." *In re Greathouse*, 189 Minn. 51, 55, 248 N.W. 735, 737 (1933). Thus, it is possible that the concept of "inherent authority" has its origins in the functions and powers possessed by the territorial courts prior to the ratification of the Minnesota Constitution. To the extent that the territorial courts provide the foundation for "inherent authority," we have abandoned that rationale by failing to tie the scope of "inherent authority" to the powers exercised by the territorial courts. *See United Prairie Bank–Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 54 (Minn.2012) (determining whether article I, section 4 of the Minnesota Constitution provides litigants in civil cases the right to request a jury trial by focusing on "whether Minnesota's territorial courts guaranteed the right to a jury trial in the *type* of action pled in a complaint" (citation omitted) (internal quotation marks omitted)).

I do not mean to suggest, however, that all invocations of our "inherent authority" have been inconsistent with the "judicial power." To the contrary, I have little doubt that the "judicial power" includes the authority to "punish direct contempt whether or not statutory authorization exists." *State v. Tatum*, 556 N.W.2d 541, 547 (Minn.1996). As we have stated, " '[t]he [contempt] power is essential to the effectiveness of all other court powers.' " *Id.* (quoting *In re Welfare of R.L.W.*, 309 Minn. 489, 491–93, 245 N.W.2d 204, 205–06 (1976)). Nor do I question a court's power to "issue orders to protect the confidentiality of documents and other records" presented to the court. *In re GlaxoSmithKline plc*, 732 N.W.2d 257, 269 (Minn.2007). Rather, my view is that these powers are reserved to the courts because they fall within the traditional understanding of the "judicial power," not because they satisfy some ethereal notion of "inherent authority." *See Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 561 (3d Cir.1985) (en banc) (describing inherent authority "as nebulous[ ] and its bounds as shadowy" (citation omitted) (internal quotation marks omitted)).

With that framework in mind, I now turn to the narrow legal question presented in this case: whether we have the authority to expunge criminal records held by the executive branch. Although it is not clear to me that district courts have the authority to expunge criminal records held in the judicial branch in the absence of statutory authority to do so,[3] the question presented in this case is straightforward. M.D.T. seeks a remedy—the expungement of criminal records held in executive agencies such as the Bureau of Criminal Apprehension and the Department of Human Services—that is beyond the traditional understanding of the "judicial power." The core of the "judicial power" is to decide cases and controversies, not to reach over to the other departments of government and order them to expunge their records. *See, e.g., Loder v. Mun. Court for San Diego Judicial Dist.*, 17 Cal.3d 859, 132 Cal. Rptr. 464, 553 P.2d 624, 636 (1976) (holding that expungement is permissible only when the legislative branch has provided a remedy); *Mulkey v. Purdy*, 234 So.2d 108, 110–11 (Fla.1970) (same); *see also United States v. Meyer*, 439 F.3d 855, 862 (8th Cir.2006) ("Permitting the expungement of a record solely on equitable grounds would interfere with state and

**3.** Although the "judicial power" extends to a court's ability to control its own records, *see GlaxoSmithKline*, 732 N.W.2d at 269, expungement presents its own set of constitutional difficulties. First, we have stated that "[i]t is the exclusive province of the [L]egislature to define by statute what acts shall constitute a crime." *State v. Forsman*, 260 N.W.2d 160, 164 (Minn.1977). It is unclear the extent to which the Legislature's plenary authority in defining criminal offenses provides it with a continuing interest in the retention of records relating to individuals who have committed crimes.

Second, in the absence of a statutory cause of action authorizing the expungement of judicial-branch records, a request for expungement would not result in a justiciable controversy in the absence of genuinely adverse parties. *See Schowalter v. State*, 822 N.W.2d 292, 299 (Minn.2012) (requiring "a genuine conflict in tangible interests between parties with adverse interests" for a justiciable controversy to arise). The dissent asserts that the judicial branch has the inherent authority to expunge records held in the judicial branch. Maybe so, although it is difficult to identify an adverse party—other than the judiciary itself—when a petitioner seeks the expungement of judicial branch records. And it is clear that the "judicial power" does not encompass cases in which a justiciable controversy does not exist. Stated differently, whatever the scope of our *"inherent* authority," it surely does not extend to actions that fall outside of our *actual* authority under article VI, section 1 of the Minnesota Constitution.

federal laws that rely on the existence of accurate and complete criminal records."). To hold otherwise would require us not only to ignore the limited scope of the "judicial power," but also to disregard the separation of powers clause in the Minnesota Constitution. The Legislature, within its grant of "legislative power," has already established a comprehensive scheme that delineates the circumstances in which the judiciary has the authority to order the expungement of executive branch records—a remedy to which M.D.T. is not entitled. *See* Minn.Stat. § 609A.01 (2012) ("This chapter provides the grounds and procedures for expungement of criminal records...."). M.D.T.'s request, "if granted, would amount to an extraordinary inter-branch incursion," *United States v. Lucido*, 612 F.3d 871, 875 (6th Cir.2010), because the other departments of government have already spoken in an area that falls within their constitutional grant of authority.

In light of the limited scope of the "judicial power" and the constitutional mandate for separation of powers, I agree with the court that the district court abused its discretion in relying on "inherent authority" to expunge executive-branch records. However, because I depart from the court's reasoning, I concur only in the result.

ANDERSON, PAUL H., Justice (dissenting).

> **Jean Valjean:** But this is common humanity! Are you a machine?
>
> **Inspector Javert:** I am an officer of the law doing my duty. I have no choice in the matter. It makes no difference what I think or feel or want. It has nothing to do with me—nothing! Can't you see that?

*Les Misérables.*[1]

\* \* \*

This case turns on the answer to a single question: Are the benefits of expunging M.D.T.'s criminal records commensurate with the disadvantages to the public and the burden on the court in administering and enforcing the expungement order? This may appear at first glance to be a simple, straight-forward question; but it is a complex and difficult question to answer. This complexity and difficulty leads to the differing answers articulated by the majority, the concurrence, and the dissent. The majority answers the question by concluding that the district court lacks the inherent authority to expunge any of M.D.T.'s criminal records that are held by the executive branch because expunging those records is not necessary to the performance of a "unique judicial function." I disagree with that conclusion and would hold that our court has the power to grant M.D.T. relief. Therefore, I dissent.

In my view, our branch of government—the judicial branch—has the inherent authority to manage and control its own records, and we can utilize this authority to expunge criminal records we create or generate. I conclude that this is so even when the executive branch becomes a repository for some of our records. When the majority reaches a contrary conclusion it essentially eviscerates our authority to control our own records. This conclusion ignores one of our core functions and undermines our position as a separate, co-equal branch of government. The end result of the majority's and concurrence's approach is that M.D.T. and other similarly situated Minnesotans are deprived of a meaningful remedy under the law.

I begin my analysis by reiterating some of the key facts underlying M.D.T.'s sec-

---

1. *Les Misérables* (Twentieth Century Fox Film Corp. 1952).

ond petition for expungement. I begin this way because if this case is to be properly understood, M.D.T.'s story must be told. Her story is a cautionary tale about how important it is to know and follow the law. It is a tale about how an ordinary citizen who commits an act that is both foolish and criminal endures the consequences that flow from that act. It is also about how the executive exercises its power to prosecute a criminal act. But most importantly, it is a tale about how a citizen searches for redemption and attempts to move on with her life after having paid her debt to society for a criminal act. In many ways, M.D.T.'s story also reflects who we are as a society—our concept of justice, how we punish, our ability to forgive, and even our *willingness* to forgive. Finally, M.D.T.'s story, ending with the result reached by our court today, illustrates how those of us who inhabit Minnesota's judiciary differ in our understanding of what constitutes a core function of the judiciary, how the judiciary is empowered to use its authority to perform a core function, and, more broadly, the role the judiciary plays in our scheme of government under the Minnesota Constitution.

*M.D.T.'s Arrest, Detention, and Interrogation*

On February 7, 2006, the Worthington Police Department detained 21–year–old M.D.T. after she presented an altered prescription for Robitussin at a local pharmacy. Robitussin contains codeine, which is a controlled substance. The writing on M.D.T.'s prescription form raised questions for the pharmacist, who then called M.D.T.'s physician to verify the proper dosage on the form. After ascertaining the proper dosage from the physician, the police were called to the pharmacy to investigate. The police officer who went to the pharmacy detained M.D.T. and took her to the local law enforcement center where she was interrogated.

The interrogation of M.D.T. was recorded. The officer conducting the interrogation started the interview by giving M.D.T. a *Miranda* warning. M.D.T responded to the warning by acknowledging that she understood what it meant. She also indicated to the officer her willingness to be cooperative. She did not ask to have an attorney present during the questioning. From viewing the interview, it is apparent that M.D.T. was ill because she was coughing and appears to be tired. She told the officer that all she wanted to do was go home and go to bed. It is also apparent that the experience of an in-custody police interrogation was foreign to M.D.T.

In her initial statements to the police, M.D.T. tried to explain the altered writing as being the result of a mistake that most likely occurred inadvertently as she was writing her Hy–Vee "grocery list." The officer reacted to this explanation with justifiable skepticism and pressed M.D.T. for a more credible explanation. M.D.T. ultimately admitted that she had purposely altered the prescription dosage on the form by increasing the dosage from 200 milliliters to 400 milliliters. She told the officer she changed the prescription because she did not have enough money to go back to the doctor if it did not work. She apologized and stated that she did not do it because she used drugs. M.D.T. steadfastly maintained that, as a married woman and regular churchgoer, she neither used drugs nor condoned their use. Following the foregoing admission, the officer left the room and then returned to tell M.D.T. that she was being "booked."

At this point it should prove helpful to actually view an image of the altered prescription, because words of explanation can be subjective and may not be adequate to

explain what M.D.T. did. The alteration is as it appears below.

### The Charges

Following the interview, the matter was referred to the Nobles County Attorney for a decision on criminal charges. At this point the county attorney had several alternatives available to him. He could have decided not to file any charges. Alternatively, he could have referred the matter to the city attorney for treatment as a misdemeanor or gross misdemeanor. He also had the authority to charge M.D.T. with a felony. The county attorney chose to charge M.D.T. with three separate felony offenses: two aggravated forgery offenses, each of which carried a maximum penalty of 10 years of imprisonment and a $20,000

fine, and a controlled substance offense, which carried a maximum penalty of 5 years of imprisonment and a $10,000 fine.

### Court Proceedings and Disposition

M.D.T. sought to have the charges against her dismissed for insufficient evidence, but the district court denied the motion. The court specifically cited M.D.T.'s statement made at the end of her police interview as the reason for the denial. On October 16, 2006, M.D.T. submitted a petition to plead guilty by tendering an *Alford* plea on one of the aggravated forgery counts—the uttering or possessing charge.[2] The county attorney and M.D.T.'s defense counsel jointly recom-

---

**2.** An *Alford* plea—also known as a *Goulette* plea in Minnesota—permits a defendant to "plead guilty to an offense, even though the defendant maintains his or her innocence, if the defendant reasonably believes, and the record establishes, the state has sufficient evidence to obtain a conviction." *State v. Ecker,*

524 N.W.2d 712, 716 (Minn.1994) (citing *North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (holding that a court may constitutionally accept a defendant's guilty plea even though the defendant maintained his or her innocence)).

mended a "Stay of Imposition of Sentence" subject to "the normal conditions of Probation," a fine, and a requirement that M.D.T. be prohibited from using or possessing nonprescription controlled substances and be subjected to random tests to ensure compliance. The district court accepted M.D.T.'s plea, convicted her of the aggravated forgery by uttering or possessing offense, and dismissed the other two counts.

The district court referred M.D.T.'s case to the Rock–Nobles Community Corrections (Community Corrections) office for a presentence investigation. The presentence report was issued on December 7, 2006, and Community Corrections made the following recommendations for sentencing:

RECOMMENDATIONS:

*Aggravated Forgery–Uttering or Possessing*

This offense is a severity level 2 offense and [M.D.T.'s] criminal history score is 0 which makes her guideline sentence *a stayed year and a day.*

3. The complete list of the special and general conditions of M.D.T.'s probation was as follows:

I. SPECIAL CONDITIONS

I shall abide by the following special conditions set forth by the Court in my sentence:

1. Pay a fine together with surcharges and fees of $879; $279 shall be payable in accordance with a payment schedule to be established by your probation agent and the balance shall be payable in a lump sum on January 16, 2010.
2. Abstain from the use or possession of alcohol and all mood-altering substances unless prescribed by a physician and shall submit to random testing of blood, breath, or urine to verify compliance.
3. Provide a DNA sample.
4. Probation for three years and abide by all terms, conditions, rules and regulations of probation.
5. Violate no laws of a misdemeanor level or greater and otherwise be of good conduct and behavior.

I recommend [M.D.T.] be sentenced to a *stay of adjudication* and be placed on probation with the following conditions:

1. Pay a fine and fees as outlined by the Court.
2. No use or possession of non prescription controlled substances.
3. Submit to random testing to verify compliance.

(Emphasis added).

At the sentencing hearing, the district court did not implement the recommendation in the presentence report to stay adjudication or impose the guideline sentence of "a stayed year and a day." Instead, the court placed M.D.T. on three years of supervised probation and ordered her to pay an $879 fine. The court also imposed numerous conditions of probation, including (1) that she submit to searches of her person, home, and property; (2) that she provide a DNA sample; (3) that she abstain from the use or possession of alcohol; and (4) that she seek permission before leaving the state.[3]

II. GENERAL CONDITIONS

1. I shall obey all State and Federal laws and local ordinances.
2. I shall report to my agent as directed.
3. I shall advise my Agent prior to making any changes in my employment and/or residence.
4. I shall obtain permission from my Agent before leaving the State.
5. I shall, by the next business day, notify my Agent if I am arrested or issued a summons.
6. I shall, when ordered by my Agent, submit to search of my person, residence or any other property under my control.
7. I shall abstain from the illegal use or possession of controlled substances and shall submit to testing to verify compliance.
8. I shall not own, use or possess a firearm if prohibited by law.
9. I shall cooperate and be truthful with my Agent in all matters.

M.D.T. complied with all of the special and general conditions of her probation. As a result, on February 5, 2008, she received an early discharge from probation and the balance of her fine was forgiven. In addition, because M.D.T. was successfully discharged from probation, her felony conviction was reduced, by operation of law, to a misdemeanor. *See* Minn.Stat. § 609.13, subd. 1(2) (2012). The report recommending early discharge stated that discharge was warranted because M.D.T. had not violated any of the conditions of her probations and had made a "[s]atisfactory adjustment."

*First Expungement Petition*

On September 2, 2008, M.D.T. filed a pro se petition for expungement of her criminal records. M.D.T. sought expungement because she "want[ed] to move on with [her] life." She explained that she wanted to "go to college to start my career, [and] with this [conviction] on my record I am unable to follow through with my career in business management in accounting." The county attorney and the Bureau of Criminal Apprehension ("BCA") objected. The district court denied the petition, concluding that M.D.T. failed to prove either that she had rehabilitated herself in such a short period of time or that expungement would yield a benefit commensurate with the detriment to the public and the burden of issuing and administering the expungement order.

*Second Expungement Petition*

On January 31, 2011, M.D.T., with the assistance of counsel, filed her second petition for expungement. M.D.T. explained in an affidavit that she was seeking expungement because she was "charged with a felony and this will prevent my lifelong dream of becoming an accountant." M.D.T. used the second expungement petition to more fully address the circumstances surrounding her criminal offense.

M.D.T. made the following statement in her petition:

> I altered the prescription from 200 ml to 400 ml because I didn't have the money for two prescriptions and I didn't want to have to go back to the doctor for an additional prescription. I am very sorry for the mistake I made, and had no idea how serious of a crime I had committed, and the serious consequences that I now face. I have never been addicted to drugs. I do not have a drug problem. I have moved on in my life and have continued to life [sic] a crime and drug free life.

In addition to this explanation and expression of remorse, M.D.T.'s second petition contained significant evidence of rehabilitation. In May 2009, M.D.T. enrolled at Iowa Lakes Community College. She attained recognition on the dean's list for several semesters and earned a cumulative grade point average of 3.661. This academic achievement is particularly noteworthy given that the record reflects that M.D.T. completed high school with a G.E.D.

A mother who employed M.D.T. to take care of the mother's 17–year–old special needs child wrote a letter in support of M.D.T.'s petition. After describing how well M.D.T. took care of her handicapped daughter and explaining the challenges M.D.T. faced in providing proper care, the mother wrote the following about M.D.T. "As I sum up this letter I just can't say enough to show my support for [M.D.T.]. She is great!!!"

M.D.T.'s second petition also presented a lengthy account of the impact the felony conviction has had on her life. More specifically, M.D.T. documented the difficulty she experienced in finding gainful employment since her conviction. In a sworn and uncontested affidavit, M.D.T. explained that after six months of employment she

was fired by a company that assists the mentally and physically handicapped. She stated that she was fired when a background check disclosed the 2006 felony charges. She thereafter applied to work at several businesses and organizations, including Hy–Vee, Polaris, Rosenbloom, Spirit Lake Hospital, Windom Area Hospital, and Jackson County School District, but was denied employment based on her criminal record. M.D.T. also lost a job on the maintenance crew at a middle school after a background check was completed. Eventually, M.D.T. obtained a job as a cashier at a grocery store because that job did not require a background check that would disqualify her from employment.

Rock–Nobles Community Corrections responded to M.D.T.'s second expungement petition by stating that it was not opposed to expungement. But the county attorney, the Minnesota Department of Human Services ("DHS"), and the BCA objected. The county attorney argued that M.D.T. had not shown sufficient hardship or rehabilitation to justify expungement. More specifically, the assistant county attorney made the following argument to the district court:

> The—this conviction—there's no evidence that it is affecting [M.D.T.] on a daily basis like [M.D.T.'s counsel] was stating. She has continued to maintain employment and work her way up in a company, and only three years has passed since she was released from probation, not—not much time to show that she has in fact rehabilitated herself. . . . [T]here—there just simply has not been a lot of evidence of hardship to the petitioner here. She, [ ]—to—to show that she needs this expungement. She has continued to be employed and—and [ ] there is no evidence that she will not be allowed to become an accountant because of this conviction. That is pure speculation at this point so the State

would request that the motion for expungement be denied.

The BCA asserted that expungement was not warranted because "[t]he fact that [M.D.T.] is unable to secure the employment and/or housing of [M.D.T.'s] preference is not sufficient reason to justify the exercise of this Court's inherent authority." Similarly, DHS contended that "[o]rdering DHS to expunge [M.D.T.'s] criminal records would contravene DHS' statutory obligations and would leave our most defenseless citizens vulnerable to maltreatment."

Despite the foregoing objections, the district court granted M.D.T.'s second petition for expungement. The court concluded that M.D.T. had presented "clear and convincing evidence that sealing the record[s] would yield a benefit to petitioner commensurate with the disadvantages to the public and public safety of: (1) sealing the record; and (2) burdening the court and public authorities to issue, enforce, and monitor an expungement order." The court acknowledged that "precedent in the area of expungement law regarding the district courts inherent authority to expunge executive branch records is unclear." But the court concluded that "an expungement without a sealing of executive branch records held by prosecutorial offices and the [BCA] is wholly illusory." The court reasoned:

> It is this Court's opinion that [M.D.T.'s] one-time mistake of altering a minor cold medicine prescription in light of [M.D.T.'s] successful completion of probation and subsequent reduced offence [sic] level, combined with her otherwise clean criminal history and strong showing of her rehabilitative efforts does not justify the [BCA] to hinder [M.D.T.'s] employment progress for 15 years. . . . The District Court has the inherent judi-

cial authority to seal executive branch records and creates [sic] a meaningful remedy in cases such as this one.

The district court then ordered that, except for non-public records retained by the BCA, "[a]ll official records ... including all records relating to arrest, indictment or complaint, trial, dismissal and discharge shall be sealed and their existence shall be disclosed only by court order, except as authorized by law." The court directed its order to the clerk of the Nobles County District Court, the Nobles County Sheriff, the BCA, the Minnesota Attorney General, the Minnesota Department of Corrections, the Nobles County Attorney, the Worthington City Police Department, the Probation/Court Services Department, and the Worthington City Attorney.

*Appeal to the Court of Appeals*

The county attorney appealed to the court of appeals, which affirmed the district court's order in its entirety. *State v. M.D.T.*, 815 N.W.2d 628, 639 (Minn.App. 2012). The court of appeals concluded that the district court did not abuse its discretion by expunging M.D.T.'s criminal records because control of criminal records that are created or generated by the judiciary implicates a core judicial function, even if those records are maintained by the executive branch. *Id.* at 638–39. The court of appeals stated:

> By permitting the executive branch to maintain and disseminate criminal records that the judiciary has both created and expunged, the authority of the judiciary to perform its judicial function is curtailed. By restricting a district court to an expungement order that is limited to criminal records maintained by the judiciary, when the executive branch maintains and broadly disseminates those same records, the judiciary has, in effect, ceded its role of offering a true

remedy to those entitled to it or determining fair punishment of offenders.

*Id.* at 638. The court of appeals further concluded that the district court "fashioned a pragmatic solution to address both the individual rights of the expungement petitioner and the record-keeping function of the executive branch" by sealing the executive branch records but acknowledging that "under proper circumstances and for good cause shown [those records] could be reopened." *Id.* at 639.

The State petitioned our court for further review.

I.

We last confronted the scope of our inherent authority to expunge criminal records maintained by the executive branch in *State v. S.L.H.*, 755 N.W.2d 271 (Minn.2008). I concurred in *S.L.H.'s* result but wrote separately because I was "concerned that [the court's] inherent authority ... could in the future be construed more narrowly than it ought to be based on the wording of the majority opinion." *Id.* at 282 (Anderson, Paul H., J., concurring). Today, the majority vindicates the concern I expressed in *S.L.H.* when it construes the scope of our inherent authority so restrictively that it essentially eviscerates the district court's power to craft a "meaningful remedy." As a result, Minnesotans must be prepared to accept the reality that expungement based on the judiciary's inherent authority to control court records is essentially an illusory remedy. Unlike the majority, I would conclude that neither our case law nor separation of powers principles preclude a district court from exercising its inherent authority to expunge court records simply because the judiciary disseminated those records to another branch of government.

## A.

Before I discuss the grounds for my disagreement with the majority's legal reasoning, it is appropriate to pause for a moment to review what "expungement" means under Minnesota law. The verb "expunge" ordinarily means "[t]o erase or destroy." *Black's Law Dictionary* 621 (8th ed. 2004). But, as we have previously explained, " 'expungement' is not limited to destruction of records." *State v. C.A.*, 304 N.W.2d 353, 357 (Minn.1981). To the contrary, "expungement" in Minnesota "may consist of the return of the records to the person seeking relief, or the sealing of the records, subject to reopening only upon court order, rather than destruction." *Id.* Here, the district court did not order the executive branch to "erase or destroy" M.D.T.'s criminal records. Rather, the district court sealed M.D.T.'s criminal records.[4] With the foregoing understanding of the meaning of expungement in mind, I will proceed to address the issue of whether the district court abused its discretion by ordering the expungement—sealing—of M.D.T.'s criminal records held in the executive branch.

As the majority correctly points out, there are two bases for expungement of criminal records in Minnesota: Minn.Stat. ch. 609A (2012) and the judicial branch's inherent authority. *S.L.H.*, 755 N.W.2d at 274. In my view, the district court correctly concluded that it had the inherent authority to expunge M.D.T.'s criminal records held in the executive branch. The court properly grounded its decision on the

test that we articulated in *C.A.*, 304 N.W.2d at 358. In *C.A.*, we recognized that courts possess the inherent authority to "grant relief when it is necessary to the performance of their unique judicial functions." *Id.; see also State v. R.L.F.*, 256 N.W.2d 803, 808 (Minn.1977) (holding that courts also possess the inherent authority to grant expungement when "the petitioner's constitutional rights may be seriously infringed by retention of [ ] [criminal] records").

We also noted in *C.A.* that one aspect of our unique judicial function is to "control court records and agents of the court in order to reduce or eliminate unfairness to individuals, even though the unfairness is not of such intensity as to give a constitutional dimension." *C.A.*, 304 N.W.2d at 358. We then said that "[u]nder appropriate circumstances," our inherent authority "extends to the issuance of expungement orders affecting court records and agents of the court." *Id.* The test we adopted for determining whether an "appropriate circumstance[ ]" exists is "whether expungement will yield a benefit to the petitioner commensurate with the disadvantages to the public from the elimination of the record and the burden on the court in issuing, enforcing and monitoring an expungement order." *Id.*

In M.D.T.'s case, the district court conscientiously applied the test we adopted in *C.A.* and concluded that sealing M.D.T.'s criminal records would yield a benefit to

---

**4.** In this respect, the district court's expungement order was limited and "singularly mindful of the equally unique authority of the legislative and executive branches of government to carry out their constitutional functions." *Barlow v. Comm'r of Pub. Safety*, 365 N.W.2d 232, 234 (Minn.1985). As we have recently explained, the plain meaning of expungement is " '[t]o erase all evidence of the event as if it never occurred.' " *In re Welfare*

*of J.J.P.*, No. A11–1146, 831 N.W.2d 260, 2013 WL 2220283 (Minn. filed. May 22, 2013). Here, the district court's order was limited: it did not order the destruction of M.D.T.'s criminal records held in the executive branch, but their sealing, and the order stated that the sealed records could be reopened under proper circumstances and for good cause shown.

her that was commensurate with the disadvantages to the public and the burden on the court. Specifically, the court found that M.D.T. "has been and will continue to be significantly hampered in securing her employment goals" due to her felony conviction, and therefore, expunging the records of that conviction would yield a benefit to her. In addition, the court found that the disadvantages to the public are minimal. M.D.T. has no criminal history other than the aggravated forgery conviction at issue here, and the record contains no evidence that M.D.T. has a "history or tendency to engage in fraud or deception," nor any evidence that "the medication [M.D.T.] was attempting to obtain was to support a drug habit or was to be used to manufacture any other illegal drugs." Taking the evidence that M.D.T. presented in her second petition for expungement together with the county attorney's arguments, and then juxtaposing them with the district court's analysis and its careful balancing of the private and public interests at stake, I am left with the firm and definite conviction that the district court made the correct decision. The court neither misapplied the law nor abused its discretion by ordering the sealing of M.D.T.'s criminal records, even if some of those records were held by the executive branch.

The majority contends that M.D.T.'s reliance on *C.A.* is misplaced because the "unique judicial function at issue in our discussion in *C.A.* was the judiciary's ability to remedy the unfairness to C.A. from the accessibility of his criminal records even after his conviction had been set aside." The majority goes on to assert that "[t]he unfairness issue we discussed in *C.A.* is simply not present in this case because M.D.T.'s conviction has not been set aside." But the majority misinterprets the unique judicial function at issue in *C.A.* In *C.A.*, the unique judicial function at issue was *not* "the judiciary's ability to remedy unfairness" or "grant . . . full relief," nor was the result in *C.A.* tied to the context of a conviction being set aside.[5] The unique judicial function we identified in *C.A.* was the control of "*court records and agents of the court.*" 304 N.W.2d at 358 (emphasis added).

This distinction is significant. Surely courts do not have a monopoly on reducing or eliminating unfairness to individuals; the legislative and the executive branches may also exercise their powers to serve that end. But the judicial branch does have the power to exercise control over its own records—records it creates or generates. In appropriate circumstances—that is, when expungement would yield a benefit commensurate with the disadvantage to the public and the burden on the court—courts can exercise that power *in order to* eliminate or reduce unfairness to individuals, even when those court-created or generated records are held by the executive branch.[6] *See S.L.H.*, 755 N.W.2d at 277–78.

---

5. Our opinion in *S.L.H.* similarly misconstrued the unique judicial function at issue in that case—indeed, that is one of the reasons I wrote separately. *See S.L.H.*, 755 N.W.2d at 277 (stating that "the judicial function at issue [in *C.A.*] was reducing or eliminating unfairness to individuals" (internal quotation marks omitted)).

6. The majority claims that the dissent's analysis is "[g]rounded primarily in dicta from *C.A.*" Yet, for at least two reasons, it is unclear what aspects of our decision in *C.A.* the majority regards as "dicta." First, the majority concedes that the balancing test we articulated in *C.A.* is "relevant . . . after the court concludes . . . that expungement is necessary to the performance of a unique judicial function." Second, the majority appears to concede that it is a unique judicial function to control court records—a part of our inherent authority that we explicitly recognized in *C.A.* The majority and the dissent simply dis-

The majority's fundamental misunderstanding of *C.A.* infects the remainder of its analysis. The majority dismisses the balancing test that the district court applied to M.D.T.'s case as irrelevant based on its conclusion that expungement of M.D.T.'s criminal records is not necessary to the performance of a unique judicial function. The majority, however, puts the cart before the proverbial horse. As explained above, *C.A.* resolved the "threshold question" of whether courts have the power to issue "expungement orders affecting court records and agents of the court," including records that are disseminated to or maintained by the executive branch. *C.A.*, 304 N.W.2d at 358. The balancing test applies to determine whether the exercise of that expungement power is warranted.[7] Only after engaging in a rather tortured reading of *C.A.* is the majority able to dismiss the balancing test used by the district court as being immaterial.[8]

**B.**

The majority supports its narrow position with respect to our ability to expunge criminal records held by the executive

branch by stating that its conclusion is "rooted in separation of powers concerns." In particular, the majority claims that a cautionary approach is necessary because of the "clear legislative expressions of policy that confirm that M.D.T.'s criminal records held in the executive branch are public information." I agree that at all times our court must approach separation of powers issues with much delicacy. In a doubtful case, we ought to be deferential to the other two branches. But, when we are dealing with powers granted to us by the people in our constitution, we are compelled by duty and have a solemn obligation to render a judgment that vindicates the existence of that power. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 139, 3 L.Ed. 162 (1810). Our inherent power to control records we create or generate is firmly rooted in the power granted by the people to the judiciary in the Minnesota Constitution. *See In re Clerk of Lyon Cnty. Courts' Comp.*, 308 Minn. 172, 176, 241 N.W.2d 781, 784 (1976) (explaining that the concept of inherent judicial power has its origin in the Minnesota Constitution).

agree—sharply—about the scope of the judiciary's authority to expunge records that the judiciary created or generated and that have been disseminated to the executive branch. Thus, even if the majority regards aspects of our decision in *C.A.* as dicta, it does not dispute either of the fundamental premises of the dissent's analysis that are derived from *C.A.*

7. The majority concedes as much when it acknowledges, in a footnote, that we did not address this so-called "threshold question" in *State v. Ambaye*, 616 N.W.2d 256, 261 (Minn. 2000).

8. The majority also relies heavily on *S.L.H.* I have already explained that, in my view, *S.L.H.* fundamentally misconstrues the unique judicial function that we recognized in *C.A.* Nonetheless, I find *S.L.H.* distinguishable for another reason. In *S.L.H.*, the district court

denied the petitioner's request for expungement of executive branch records, and we had to afford that decision deference. *See S.L.H.*, 755 N.W.2d at 274; *Ambaye*, 616 N.W.2d at 261 (reviewing the district court's decision to deny expungement of criminal records held in the executive branch for an abuse of discretion). In the case before us today, the district court reached the opposite conclusion, and deference therefore weighs in the opposite direction. Even if *S.L.H.* is factually similar to this case, the abuse of discretion standard assumes that district courts might reasonably reach different results under similar facts. *See State v. Blom*, 682 N.W.2d 578, 613 (Minn.2004); *see also Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (explaining that a district court does not abuse its discretion just because "[o]ther district courts might have reached differing or opposite conclusions with equal justification").

The majority's approach improperly elevates form over substance. Under the majority's analysis, the district court's power to seal records turns exclusively on the *situs* of those records, and whether the governmental entity with which they are stored is technically labeled as "executive" or "judicial." But we have never taken such a "doctrinaire" approach to the separation of powers. *In re Hull*, 163 Minn. 439, 444, 204 N.W. 534, 536 (1925); *see also St. Paul Cos. v. Hatch*, 449 N.W.2d 130, 135 (Minn.1989) ("[T]he founders of our national government were too practical to be controlled by an overly formalistic separation-of-powers doctrine."). Indeed, we rejected such an approach in *C.A.*, when we concluded that a court's inherent authority to order expungement could extend to nominally executive entities such as a sheriff's office, or county attorney's office, because those entities, in substance, act as agents or officers of the court. *See* 304 N.W.2d at 360–61 (noting also that police departments, correctional facilities, and the BCA "could be subject to orders not to disclose" but to a more "limited extent").

Relying on the *situs* of the records with the executive branch, as the majority does, does not answer the question of whether expungement is necessary to the performance of a judicial function. We have long recognized that "it is not always easy to discover the line which marks the distinction between executive, judicial, and legislative functions," and that these functions are often "so interwoven and connected that they cannot readily be separated and distinguished." *State ex rel. Patterson v. Bates*, 96 Minn. 110, 116, 104 N.W. 709, 711 (1905). As United States Supreme Court Justice Robert Jackson once explained, "[w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (discussing federal separation of powers principles).

Justice Jackson's concept of separation of powers under the United States Constitution also applies to the Minnesota Constitution. Moreover, his concept of the separation of powers is especially relevant in the context of criminal records because "a criminal conviction record represents the work of all three branches of government." Jon Geffen & Stefanie Letze, *Chained to the Past: An Overview of Criminal Expungement Law in Minnesota–State v. Schultz*, 31 Wm. Mitchell L. Rev. 1331, 1367 (2005). The legislature defines crimes, the executive determines whether a crime has been committed and decides whether to charge a person with a crime, and the judiciary—both judges and juries—must decide whether to convict. *See id.* at 1367 n. 197. As Justice Jackson said, the concept of separation of powers contemplates "separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635, 72 S.Ct. 863.

All of this is simply a way of saying that the Minnesota Constitution does not draw the bright-line boundaries between the branches of government that the majority's opinion suggests. Rather, we must look to the substance of the power at stake. In my view, it is uniquely within the province of the judiciary to control court records that we create or generate. I would even go further to state that control of our records is one of our core functions. Thus, while courts must respect "the equally unique authority of the executive and legislative branches of government over their constitutionally au-

thorized functions," the judiciary is empowered, in appropriate circumstances, to expunge records that we have disseminated to other branches of government—both the executive and legislative. *C.A.*, 304 N.W.2d at 359 (citing *State v. Osterloh*, 275 N.W.2d 578, 580 (Minn.1978)). Here, the district court's order sealing M.D.T.'s conviction record was directed at "all records relat[ed] to arrest, indictment, or complaint, trial, dismissal and discharge." [9] The district court's order addressed records that are indisputably tied to the judiciary: the indictment, complaint, trial, dismissal, and discharge records are "court records." As we noted in *C.A,* it is a unique judicial function to exercise control over court records. Therefore, we should not, indeed, we cannot cede control of those records simply because we at some point disseminated them to the executive branch.

## II.

At this point, I will address some other factors that may be relevant to understanding why the district court decided to grant M.D.T.'s second petition for expungement and why the court of appeals

affirmed that decision. From the time of her initial detention up through her appeal, it appears that the consequences imposed on M.D.T. as a result of her conduct have consistently fallen on the more severe end of the spectrum of possible outcomes. This is true of the decision in charging, sentencing, and the result reached by the majority today. Such results may be just—or at least permissible—under the law, but they are not inevitable. It is not inevitable that the proper execution of mandated procedures under our criminal justice system will consistently bring someone like M.D.T. to where she is today. Given the facts of this case, she need not be here; maybe she should not be here.

### Today's Result is Not Inevitable

What has and is happening to M.D.T. is not a mandated result. There are many documented instances when Minnesota district courts have exercised their inherent authority to order an expungement and those orders have not been disputed or appealed.[10] In my experience, there are several county attorneys who do not routinely oppose every expungement petition, but rather take a practical, pragmatic, and

---

**9.** The majority identifies three types of records: "(1) records created by the executive branch and held in the executive branch; (2) records created by the judicial branch and held in the executive branch; and (3) records held in the judicial branch." As I have made clear from the outset, my analysis is limited to the authority of the judicial branch to expunge records created by the judicial branch and held in the executive branch. Accordingly, I would reverse the portion of the district court's order that ordered the sealing of M.D.T.'s records not created or generated by the judiciary. The majority nonetheless asserts that my view of our inherent authority to control court records is an "unprecedented and boundless extension of inherent judicial authority." I respectfully disagree with that characterization. I concede that courts do not have the authority to expunge all records created by and held by the executive branch.

But, unlike the majority, I do not regard it as either boundless or unprecedented for our court to expunge records that we created or generated.

**10.** Recent empirical evidence illustrates that district courts continue to use inherent authority as a basis for ordering the expungement of criminal records.

> In 2010, the BCA received 2,837 criminal expungement petitions.... 223 [orders] ordered the BCA to seal its records based on the court's inherent authority; 36 orders were based on the court's inherent authority, but did not order the BCA to seal their records.

Lindsay W. Davis, *Minnesota's Inherent Authority Criminal Expungement Law: Two Years After State v. S.L.H.,* 5 Wm. Mitchell J. L. & Prac. 2 n. 2 (2012).

measured approach to each expungement request. This latter approach often means bringing all of the relevant parties to the same table to decide if expungement is the appropriate remedy. If a consensus can be reached, expungement is allowed. Without question, this approach takes some time up front and can result in much discussion and even disagreement. But this approach seeks to have the parties reach a consensus on what is a just result.

It is beyond dispute that a prosecutor is a minister of justice whose interest is not in winning cases or obtaining the most severe penalty. *See State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993). Rather, as a representative of the sovereign, a prosecutor has an obligation to see that justice shall be done. *See id.* Prosecutors have a special obligation to insure that justice is accomplished for everyone. *Id.* At oral argument, I inquired of the assistant county attorney who appeared before our court if the law does not allow some room for common humanity through the exercise of discretion by both the state and the judiciary. But the assistant county attorney appeared to have none of it.[11] I responded by stating that he was sounding a lot like Inspector Javert in the novel *Les Misérables.* The assistant county attorney responded by saying that by nature he was

somewhat sympathetic with Javert. He said that he knows that mercy must happen, but it is entrusted to the executive and the legislature, not the judiciary. I found this answer to be odd, given that county attorneys are part of the executive branch of government.[12]

I do not mean to be overly critical of the assistant county attorney for doing his duty and being "somewhat sympathetic with Javert" because Javert is not a villain. Nor is Javert ignoble. After all, Javert represents the justice system—he is a minister of justice. Victor Hugo describes Javert as symbolizing "probity, sincerity, candor, conviction, the sense of duty" and passion. Moreover, a prosecutor may act "with earnestness and vigor—indeed, he should do so" when pursuing the twofold aim that "guilt shall not escape or innocence suffer." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The problem is that the noble characteristics attributed to Javert can become counter-productive—even oppressive—when wrongly directed. That was Javert's problem; he lacked common humanity. Javert could not live with himself when he realized that, without common humanity, his noble objectives and dedication to his perceived duty under the law came to naught. As I look at the case

**11.** The Assistant Nobles County Attorney expressed this view in the following way during oral argument in this case:

Justice P. Anderson: What is the proportionate advantage and disadvantage here? And I am having a hard time seeing the advantage to society in not allowing the district court order to stand.

Assistant Nobles County Attorney: The advantage to society is that the rule of law is respected, the judgment of judges is …

Justice P. Anderson: That sounds like Javert, sir. I'm sorry. You've got to get better than that.

Assistant Nobles County Attorney: I am by nature somewhat sympathetic with Javert. But I know that mercy must happen. But

in our tripartite system of government, clemency, mercy, is entrusted to the executive and is entrusted to the legislature.

Oral Argument at 24:38, *State v. M.D.T.,* No. A11–1285 (Minn. argued Dec. 12, 2012), *available at* http://www.tpt.org/courts/MN JudicialBranchvideo_NEW.php?number=A111285.

**12.** For a more in depth discussion of the role that compassion and mercy must play in the criminal justice system when society seeks justice as its end result, see my concurrence in *State v. Streiff,* 673 N.W.2d 831, 841–42 (Minn.2004) (Anderson, Paul, H., J., concurring).

before us today, I am moved to raise a question similar to the one Jean Valjean posed to Javert: Where is our sense of common humanity? Are those of us who administer Minnesota's criminal justice system turning a blind eye to common humanity? Are we incapable of recognizing and acknowledging a sincere attempt to seek redemption? Are we unable to forgive?

The case before us today raises concerns similar to those I recently addressed during a William Mitchell College of Law symposium on Minnesota's criminal code. My concerns are framed by the aforementioned dialogue between Valjean and Javert. I have labeled certain aspects of this behavior and its consequences as "Inspector Javert Syndrome."[13] The syndrome I describe is an overly rigid, unduly strict, often unbending, and sometimes myopic pursuit of justice. While I have on several occasions observed this syndrome in action, I have reservations about how well this approach to the law works. I have, on more than one occasion, observed how this approach to the criminal law can be counter-productive to our goal to create and maintain a civil society.

The foregoing approach to criminal law can create, at a minimum, a two-fold prob-

lem for the executive and the judiciary. The first problem is that it heightens the tension between the prosecutor's legitimate authority to exercise discretion when charging an offense (an executive function) and the judiciary's role in ascertaining the proper scope and application of a criminal statute (a judicial function). The judiciary is rightfully reluctant to interfere with the prosecutor's discretionary authority in the absence of prosecutorial abuse. *See Streiff*, 673 N.W.2d at 838–39 (holding that a defendant must demonstrate an abuse of prosecutorial discretion before a district court is permitted to accept a plea of guilty to a lesser offense over the prosecutor's objection). But, the foregoing approach often allows a prosecutor to seek refuge in the statement made by Javert when faced with the issue of how to exercise the discretion granted to the prosecutor under the law.

Second, the impact of this approach on our criminal justice system can often make it difficult to achieve a just result. There are adverse results that can come from looking at the law this way. These results can be exacerbated when the core of a criminal code becomes populated with excess provisions that are vague, imprecise, irrelevant, or even foreign to the purpose of the code.[14] There should be cause for

---

**13.** I have previously used the term "Inspector Javert Syndrome" to label what I describe in this dissent. I initially believed that I had coined a new term, but I have not. The term has been used several times before. I should not have been surprised that others have used this term given how Victor Hugo conceived and defined the unforgettable character of Inspector Javert in *Les Misérables*. One example of how the term has been used elsewhere is by Professor Nathan Lewin in testimony before the United States Senate Committee on Governmental Affairs, during debate over the reauthorization of the Independent Counsel Act. *The Reauthorization of the Independent Counsel Act: Hearing Before the S. Comm. on Governmental Affairs*, 106th Cong. (1999) (Statement of Nathan Lewin),

available at www.hsgac.senate.gov/download/? id=48505c7b–455b. Professor Lewin criticized "[s]ome Independent Counsels [that] have taken on the role of Inspector Javert and treat the government official who is the target of their initial authorization as a quarry who, they feel, should be hunted down." *Id.*

**14.** The following information illustrates my point about excess foliage, i.e. our ever-expanding criminal code. In 1965, the criminal code—Minnesota Statutes Chapter 609—consisted of 32 pages; in 1969, 35 1/2 pages; in 1974, 36 pages; in 1982, 71 pages; in 1992, 137 pages, and now in 2013, 234 pages.

concern when the scope and content of a criminal code can frequently cause a minister of justice to assert that he or she has no "choice in the matter" and that it makes "no difference what [he] think[s] or feel[s] or want[s]" because it has "nothing to do" with him, he is only "an officer of the law doing [his] duty." *Les Misérables* (Twentieth Century Fox Film Corp. 1952). Moreover, what I have labeled as Inspector Javert Syndrome can have a ripple effect that results in the bogging down of the criminal justice system and that can severely overtax that system's limited resources. This ripple effect can reach to all parts of the justice system—even up to the Minnesota Supreme Court. I know this to be true, because I have on many occasions witnessed this phenomenon firsthand.

### III.

There will be a human cost that follows the opinion reached by our court today. The majority's legal reasoning and approach to separation of powers principles unduly limits our inherent authority to control court records and in so doing divorces our expungement case law from reality. As the court of appeals rightly observed:

> [T]he district courts of this state, who observe the problem of the expungement petitioner in a far more immediate setting than do the appellate courts, have demonstrated repeatedly their reluctance to follow the narrow but bright-line rule of *S.L.H.*, as we have suggested. Some of those courts chafe at the law but apply it, and others, including the judge in this case, recognize that the current state of the law eviscerates the authority of courts to issue meaningful orders and permits a serious infringement of an individual's fundamental rights in the name of a separation of powers concern that permits, on behalf of the *executive* branch's right to retain records created by the *judicial* branch, nullification of district court orders.

*M.D.T.*, 815 N.W.2d at 636.

An expungement remedy that does not extend to judicial branch records held by the executive branch is essentially no remedy at all. By limiting our inherent authority, the majority effectively consigns M.D.T. to a large and growing group of citizens who seek to turn their lives around but cannot do so because of the way we interpret our expungement law. More specifically, the collateral consequences of conviction will endure for this growing group of citizens long after they have served the punishment imposed as the result of their criminal act. *See generally* Am. Bar Assoc., *National Inventory of the Collateral Consequences of Conviction,* http://www.abacollateralconsequences.org/ CollateralConsequences/RetrieveValues? id=Minnesota (last visited May 13, 2013) (noting that Minnesota recognizes more than 100 conviction-specific sanctions for crimes involving fraud in addition to the sentence imposed by the court). Moreover, the majority's interpretation of the law comes at a time when the collateral consequences of a criminal conviction are growing more severe and pervasive due to the explosion in the creation, retention, and dissemination of criminal records. *See, e.g.,* James Jacobs & Tamara Crepet, *The Expanding Scope, Use, and Availability of Criminal Records,* 11 N.Y.U.J. Legis. & Pub. Pol'y 177, 203–210 (2008). Unfortunately, the easy accessibility of those records has a disproportionate impact on communities of color because of racial disparities in incarceration rates. *See* Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity,* 85 N.Y.U.L. Rev. 457, 470 (2010).

There should be a remedy for persons like M.D.T.—and there is—but our court fails to implement it. In my judgment, the Minnesota Constitution and our case law provide a firm and principled legal path to affirm the just decisions rendered by the district court and the court of appeals. Unfortunately, the majority has seen fit to reject this path, a path that is both legally sound and paved with common sense.

### IV.

In conclusion, the Minnesota Constitution divides the power of government into three distinct and *co-equal* branches. Minn. Const. art. III, § 1. Under the constitution, Minnesota's judiciary is not, and should not be, relegated to the role of a junior partner in the enterprise of the government of the State of Minnesota. When exercising the judicial power—a power the Minnesota Constitution vests in us—we have the authority to order an expungement remedy when the circumstances warrant it. *See* Minn. Const. art. VI, § 1. By holding that the district court lacked the authority to expunge M.D.T.'s criminal records held by the executive branch, the majority misinterprets and misapplies both the constitution and our case law; takes a narrow approach to the separation of powers; strips district courts of the discretion they ought to be able to exercise; diminishes one of our core functions; and eviscerates the judiciary's ability to perform that core function.

For these reasons, and all of the foregoing, I respectfully dissent.

PAGE, J. (dissenting).

I join in the dissent of Justice Paul H. Anderson.