STRAS, Justice
(dissenting).
If the caption of this case accurately reflected the nature of this appeal, it would say In re the Interpretation of Minn.Stat. § 521p.5-318(c)(h)(i), rather than In re the Guardianship of: Jeffers J. Tschumy, Ward.
The reason is that this appeal has little to do with Jeffers Tschumy. When Tschu-my was alive, Abbott Northwestern Hospital sought and obtained a court order to cease providing life-sustaining medical treatment to Tschumy, who died shortly thereafter. At that point, there was nothing left for the district court, or any other court, to decide in order to resolve the parties’ dispute. It is now more than two years after the cessation of treatment and Tschumy’s death, and the parties to the original dispute have received exactly the relief that they requested. Yet the parties in this appeal still seek an answer to the question of whether a court order was required to remove life support, a controversial and difficult legal question that is purely academic at this point.
The parties’ request strikes at the very heart of judicial power. For nearly 150 years, we have consistently declined to answer purely academic questions, no matter how interesting or important they are, because courts do “not issue advisory opinions or decide cases merely to make prece-dente ].” Sinn v. City of St. Cloud, 295 Minn. 532, 533, 203 N.W.2d 365, 366 (1972). Yet despite our longstanding prohibition on advisory opinions, the plurality is ready and willing to answer the parties’ question because, in its view, the case is functionally justiciable and the legal issue is sufficiently important. I respectfully dissent because the plurality’s approach casts aside *753 the fundamental limitations on our authority and aggrandizes judicial power at the expense of the Legislature — the branch of government that the Minnesota Constitution vests with the authority to address abstract policy questions. Minn. Const, arts. Ill, § 1, IV, § 1.
I.
Jeffers Tschumy became a ward of the state in June 2005, when the district court appointed a conservator for him. A little more than two years later, the guardianship case underlying this appeal began when a social worker petitioned the district court to appoint Tschumy’s cohservator as his guardian. At the time, Tschumy was 52 years old and suffered from paranoid schizophrenia, anxiety, and a depressive disorder. The district court granted the guardianship petition in April 2008.
The district court later dismissed the original guardian for cause and appointed a professional guardian, Joseph Vogel, to act on Tschumy’s behalf. When the court appointed Vogel, it granted him the power to “[g]ive any necessary consent to enable, or to withhold consent for, [Tschumy] to receive necessary medical or other professional care, counsel, treatment or service.”
In April 2012, Tschumy suffered serious injuries when he choked on food. Tschu-my was admitted to Abbott Northwestern Hospital (the “Hospital”), and the medical staff placed him on life support. Medical tests determined that Tschumy had suffered a serious brain injury from lack of oxygen. One week later, the medical staff advised Vogel that any further medical intervention on Tschumy’s behalf would be futile, and possibly even harmful to him, and that all life-sustaining medical treatment should cease. VogeJ agreed and directed the hospital to withdraw life support.
The Hospital did not follow Vogel’s direction. Instead, it asked the district court to grant the power to Vogel “to specifically authorize the ... removal of life support systems.” The next day, the district court held a hearing on the motion. At the hearing, the Hospital explained that it was unsure whether the existing guardianship letter permitted Vogel to unilaterally direct the removal of life support, so it sought either “clarification” of the existing letter or an amendment that would grant such authority to Vogel. Vogel opposed the Hospital’s motion because he believed that he already had such authority and that it “would set an awful precedent” if a hospital had to “run to court to get an order for clarification” each time a guardian requested the withdrawal of life support from a ward. Nevertheless, Vogel emphasized to the court that “[t]here [was] no disagreement anywhere” and “really no controversy” over whether to withdraw life support.
The district court expressed concern that Tschumy’s “voice [wasn’t] being heard, except as expressed by Mr. Vogel, based on an appointment from a few years ago.” The court therefore appointed Michael Biglow as Tschumy’s attorney “to do some foot work to get a sense of Mr. Tschumy’s situation[,] what his desire would be[,] and what the medical situation would be.”
Soon thereafter, Biglow filed a report with the court. Tschumy was completely nonresponsive following the choking incident, so in drafting his report, Biglow relied on Tschumy’s medical records and information that he had gathered from others, including Vogel, who purported to have knowledge of Tschumy’s preferences. In the report, Biglow did not take a position on the legal issue of whether Vogel had the authority to unilaterally direct the hospital to withdraw life support. Instead, Biglow “advocate[d] on [Tschumy’s] behalf that moving *754 from active treatment to comfort care would be in [his] best interests.”
The district court then held another hearing. The hearing addressed two questions: (1) whether to withdraw life support; and (2) whether Vogel had the legal authority to direct the Hospital to remove life support. As to the first question, both Biglow and Vogel testified. Following their testimony, the Hospital’s attorney stated that “there doesn’t seem to be any dispute” among the parties that “[t]he best course of treatment would be to withdraw care.”
As to the second question, the court heard testimony from Stephen Grisham, a professional guardian whom Vogel offered as an expert witness. Grisham did not address Tsehumy’s case specifically, but instead testified generally about the role of guardians in making end-of-life decisions. He discussed the training that he and other professional guardians receive, and gave his opinion on “what would happen [if] the Court were to issue an order that basically said that [guardians] had to come to court for a review on every one of these termination of life support cases.” He said that it would “change the landscape dramatically.”
After Grisham’s testimony, Vogel’s attorney reiterated his belief that Vogel “already has the authority” to direct the withdrawal of life support. At the court’s invitation, Biglow provided his own opinion and took the opposite view. The attorney for the Hospital then pointed out that the broader legal question regarding the authority of guardians to direct the removal of life support “is [not] necessarily something that needs to be decided in this case,” and that the court could instead limit its decision to whether the Hospital could withdraw life support from Tschumy in this particular case. The court responded that the question regarding the scope of a guardian’s authority in end-of-life decisions “obviously creates a lot of complications and no[n-]uniformity across the state,” such that “there may be some value in getting some uniformity” on the question.
The district court issued two orders after the hearing. In the first, the court described the case as involving “two questions of ultimate significance for Jeffers Tschumy: First, should Mr. Tschumy be taken off life support and allowed to die? Second, who has the power to decide whether Mr. Tschumy will live or die: the Court or the guardian?” With respect to the first question, the court authorized the Hospital to withdraw life support. The court promised to address the second question in a later order, saying:
The issue of who has the power to order the removal of life support — the Court or the guardian — is of great significance to thousands of wards, guardians, and family members throughout Minnesota. It is also one subject to a variety of perspectives, practices, and practicalities. If there could be only one thing in our judicial system that is consistent, fair and practical, it should be the process by which our justice system allows death to come to its citizens. The issue is of statewide significance; it is subject to a range of practices and policies; it does not lend itself to easy appellate review; it has escaped the attention of our legislature; and it relates to the fundamental beliefs of life and death. The Court would not serve the people of Minnesota well if it danced around the issue and left the power and process of death as uncertain as it is now. Accordingly, the Court will address that issue, but by separate order so as to allow Mr. Tschumy to be removed from life support.
The order granted the precise relief that the Hospital had sought in its motion— *755 namely, court authorization to remove Tschumy from life support — and no one appealed from the order.
Tschumy died on May 10, 2012, one day after the court authorized the removal of life support, and seventeen days after the Hospital had sought relief in the district court. Under Minn.Stat. § 524.5-317 (2012), “[a] guardianship terminates upon the death of the ward or upon order of the court,” so Vogel’s appointment as Tschu-my’s guardian terminated by operation of law on the date of Tschumy’s death. Vo-gel nevertheless petitioned for discharge as Tschumy’s guardian, and one week later, the district court granted the petition. Thus, Vogel sought and received his discharge as Tschumy’s guardian.
The district court issued its second order approximately five months later, in October 2012. As framed by the district court, the question before it was whether, as a general matter, a guardian or a court must decide whether to remove a ward from life support. The district court noted that, in In re Conservatorship of Torres, 357 N.W.2d 332 (Minn.1984), this court had concluded that a probate court could authorize a conservator to order the removal of life support from a ward but did not address whether a guardian could do so without court approval. The district court said that, “[b]ecause neither the Torres court nor the Legislature have addressed whether a guardian has the power to authorize the removal of life support, this Court is left to pick up where the Torres court left off.” The district court concluded that, “under Torres and the current statutory scheme, courts must make end-of-life decisions when a guardian has been appointed.”
Although the court labeled its opinion an “order,” the opinion did not actually order anyone to do anything, nor did it decide a disputed legal question of significance to Tschumy or to his estate. In fact, other than briefly reciting the facts of Tschumy’s case, the order did not say anything at all about Tschumy. The order concluded with the following statement:
Minn.Stat. § 524.5-313 grants broad power to guardians to consent to necessary medical treatment on behalf of their wards, but it does not specifically convey the power to terminate life support. Hopefully, the Legislature or higher judicial authority will definitively determine who can make end-of-life decisions, and how those decisions must be made. Until that time, this Court concludes that guardians under the Court’s jurisdiction must ask the court for authorization to terminate life support when there is not a valid health care directive addressing end-of-life circumstances.
A few days later, the district court ordered Vogel to “remain on the case pending ... appeal.” And despite his earlier discharge as Tschumy’s guardian, Vogel filed a notice of appeal from the district court’s October order. Recognizing the complications created by the odd procedural posture of the case, the court of appeals directed the parties to “file informal mem-oranda on the questions of whether the order filed on October 18, 2012, is independently appealable, whether appellant has standing to appeal, and whether the appeal is moot.” The court of appeals ultimately concluded that the October order was ap-pealable, Vogel had standing to appeal, and the appeal was not moot. As to the merits, the court of appeals concluded that a guardian who has been granted medical-consent authority under Minn.Stat. § 524.5-313(c)(4)(i) may, “absent objection by an interested person and with advice from available family members, physicians, and an ethics committee, ... direct the disconnection of life-support systems without further authorization from the district court.” In re Guardianship of Tschumy, 834 N.W.2d 764, 775 (Minn.App.2013).
*756 Biglow, ostensibly acting on Tschumy’s behalf, petitioned this court for review of the court of appeals’ decision. We granted Biglow’s petition, but it is still unclear why Biglow sought review. He has never once spoken with Tschumy and was appointed solely to report on Tschumy’s desires and medical situation in order to help the district court decide whether to grant the Hospital’s motion to remove life support. At oral argument, the parties notified the court that Tschumy’s estate has paid for all of the legal fees incurred by both sides. While Biglow’s motivation for the appeal is unclear, Vogel seeks a definitive answer to the question of whether approval from the district court is required to withdraw life-sustaining medical treatment for a ward because, as a professional guardian, he may be placed in the same situation again and he seeks guidance on how to proceed.
II.
It is still unclear why, or how, this case is before us, and on whose behalf the two parties are acting. For its part, the plurality asserts that the legal issue in this case is important and the case is functionally justiciable, so we should just go ahead and decide it. The problem is that this case has all of the hallmarks of a nonjusti-ciable controversy. The parties appealed from an advisory opinion of the district court, the same pot of money is paying for the legal fees incurred by both parties, and there is no way to order meaningful relief for anyone in this litigation regardless of the legal conclusion that we reach. Under these circumstances, in which there is no case or controversy, it is our duty under the Minnesota Constitution to dismiss the appeal.
A.
The Minnesota Constitution does not grant us the authority to “decide cases merely to make precedents.” Doyle v. Ries, 205 Minn. 82, 84, 285 N.W. 480, 481 (1939); accord, e.g., In re Schmidt, 443 N.W.2d 824, 826 (Minn.1989); Sinn, 295 Minn, at 533, 203 N.W.2d at 366. Rather, “[w]e make precedents only as incident to the determination of actual controversies.” Works v. Tiber, 169 Minn. 172, 173, 210 N.W. 877, 878 (1926). As we recognized in 1865, only 8 years after Minnesota became a state, requiring judges to decide legal questions in the absence of an actual controversy is “inconsistent with judicial duties” and would set “a dangerous precedent.” In re Application of the Senate, 10 Minn. 78, 81 (Gil.56, 58) (1865).
We are not a junior-varsity legislature. The parties ask us to decide a legal question that is completely disconnected from any case or controversy and to make a pure policy decision about how guardians should act in the future when making life-ending decisions for a ward.[1] Instead of *757 reiterating the longstahding principle that we do not decide cases merely to make precedent and recognizing that pure policy decisions are for the Legislature to make, the plurality would adopt what is, in essence, a different rule: we do not decide cases merely to make precedent, unless we say differently. However, the plurality’s rule would itself set a “dangerous precedent” and “[t]he evils which might result to the people from such a source will suggest themselves on a moment’s reflection.” Id.
To be sure, this case has its roots in what was once a justiciable controversy. Vogel, acting on Tschumy’s behalf, directed the Hospital to cease giving life-sustaining medical treatment to Tschumy, but the Hospital refused to do so without a court order. The Hospital, in refusing to follow Vogel’s instructions, was necessarily adverse to Tschumy, and by extension, Vo-gel, who represented Tschumy’s interests. Thus, the controversy between Tschumy and the Hospital — neither of which has any interest in the proceedings before this court — was justiciable at its inception. See Onvoy, Inc. v. ALEETE, Inc., 736 N.W.2d 611, 617-18 (Minn.2007) (setting forth the requirements of a justiciable controversy).
When the district court authorized Tschumy’s removal from life support in May 2012, however, the controversy ended and there was nothing left to decide. The Hospital, which had commenced the litigation, received the court authorization that it sought and advised the district court that it did not seek any other relief. In fact, the Hospital’s attorney told the district court that “the decision about Mr. Tschumy can be made without [addressing the broader legal question] at all, and may[]be [it] should be.” Tschumy also received the relief that he, as represented by Vogel (his guardian) aiid Biglow (his court-appointed attorney), had sought: authorization for the cessation of life-sustaining treatment. Yet, nearly 5 months later, the district court issued a second order, in which it broadly concluded that guardians do not have the authority to unilaterally withdraw life-sustaining medical treatment from a ward under the guardianship statutes, even though by the time of the second order, the case had long been moot.
The only person left unsatisfied by the district court’s decision was Vogel. In his capacity as Tschumy’s guardian, Vogel received exactly the relief he sought, and he has never contended otherwise. However, in his personal capacity as a professional guardian — entirely separate from his role in this particular case — Vogel would have preferred to win in a different way. Instead of obtaining court approval to withdraw treatment, Vogel wanted a court order saying that he already had the authority to direct the withdrawal of life support. Vogel made his opinion clear when he said that, if the district court decided to say (as it eventually did) that court approval was required to terminate treatment, such a ruling would be “an awful precedent.”
Vogel’s position, which the plurality must necessarily view as sufficient to create a justiciable controversy, suffers from several problems. First, Vogel’s standing in this litigation has always been derivative of Tschumy’s interests, and he has thus lacked standing throughout the appellate process, both because neither Tschumy nor his estate has any further interest in the case, and because Vogel is no longer serving as Tschumy’s guardian. See infra Part II.C. To my knowledge, we have never held that a person who had a purely representational interest in the district court can assert a personal interest on appeal. There is, after all, a reason why the caption of this case says In re the *758 Guardianship of: Jeffers J. Tsehumy, Ward, rather than In re the Personal Interests of: Joseph Vogel, Professional Guardian. See Minn.Stat. § 524.5-106 (2012) (stating that the purpose of guardianship proceedings is to adjudicate rights relating to the ward).
Second, even if Vogel could now assert a purely personal interest on appeal, “[y]ou cannot persist in suing after you’ve won.” Greisz v. Household Bank (III.), N.A., 176 F.3d 1012, 1015 (7th Cir.1999). Once a litigant has obtained the relief that he or she requested below, the fact that the litigant wishes the court had said something different in its opinion does not provide a sufficient continuing interest for an appeal. See In re Custody of D.T.R., 796 N.W.2d 509, 513 (Minn.2011) (explaining that “a party must be aggrieved in order to appeal” and that a party is not aggrieved unless “that person’s rights were injuriously affected by the adjudication” (citation omitted) (internal quotation marks omitted)); see also, e.g., III. Bell Tel. Go. v. III. Commerce Comm’n, 414 Ill. 275, 111 N.E.2d 329, 334 (1953) (“It is fundamental that the forum of courts of appeal should not be afforded to successful parties who may not agree with the reasons ... below.”). In other words, justiciability focuses on “whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation).” Air Line Pilots Ass’n Intern, v. UAL Corp., 897 F.2d 1394, 1396 (7th Cir.1990) (citing North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)).
Third, the personal interest asserted by Vogel on appeal — that the district court adopted the wrong legal rule — is clearly insufficient in light of the fact that district court orders have no precedential value and govern only the rights of the parties to the litigation. See Green v. BMW of N. Am., LLC, 826 N.W.2d 530, 537 n. 5 (Minn. 2013) (“That the district court orders lack precedential value ... informs the weight we will give them.”); Kmart Corp. v. Cnty. of Steams, 710 N.W.2d 761, 769-70 (Minn. 2006); see also Minn.Stat. § 480A.08, subd. 3(c) (2012). It is difficult to understand how Vogel could retain a sufficient continuing interest, even in his personal capacity, in seeking the reversal of a legal rule adopted in a nonprecedential opinion that, by definition, applied only to Tschu-my and the Hospital. See D.T.R., 796 N.W.2d at 512 (stating that an individual’s interest in litigation must be ‘“actual or imminent, not conjectural or hypothetical’ ” (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))); State by Humphrey v. Philip Morris, Inc., 551 N.W.2d 490, 495 (Minn.1996) (stating that a litigant must have a direct interest in the litigation rather than asserting just an abstract concern). Such an interest is at best hypothetical, and most likely fictional.
Fourth, it is questionable whether there are any adverse parties in this case at all. Vogel, ostensibly acting as Tschumy’s guardian, is depleting the funds in Tschu-my’s estate in an effort to obtain a non-“awful precedent” from this court. But Tschumy’s estate is also paying the legal fees incurred by the other side — represented by Biglow, the court-appointed attorney who ostensibly represents Tsehumy in this appeal — to advocate against Vogel’s position. Tschumy’s estate cannot simultaneously have an interest in two totally opposite rules: on the one hand, a rule that a court order is not required to remove life support (advanced by Vogel), and on the other, a rule that a court order is required to remove life support (advanced by Biglow). Cf. Minn.Stat. § 524.5-502(b)-(e) (2012) (authorizing compensation when an attorney “render[s] *759 necessary services with regard to ... the administration of the protected person’s estate” or a guardian “render[s] necessary services ... for the benefit of the ward”). In short, there is good reason to doubt that the parties are truly adverse when the same pot of money is funding the litigation expenses of both sides. See United States v. Johnson, 319 U.S. 302, 305, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (concluding there was a lack of adversity when, among other things, the legal fees of both the plaintiff and the defendant were paid for by the same party); Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 344-46, 12 S.Ct. 400, 36 L.Ed. 176 (1892) (rejecting “a friendly suit” between two parties because it lacked adversity).
What is clear, therefore, is that Vogel and Biglow seek an advisory opinion — that is, they do not truly wish to resolve a current dispute, but instead seek our advice, as they sought the advice of the court of appeals, on an abstract legal question. We have said that a justiciable controversy exists “if the claim (1) involves definite and concrete assertions of right that emanate from a legal source, (2) involves a genuine conflict in tangible interests between parties with adverse interests, and (3) is capable of specific resolution by judgment rather than presenting hypothetical facts that would form an advisory opinion.” Onvoy, 736 N.W.2d at 617-18; see also Schowalter v. State, 822 N.W.2d 292, 299 (Minn.2012) (applying the three requirements from On-voy in determining that one of the issues in the case was not justiciable). This case does not satisfy any of the three requirements. Cf. Schowalter, 822 N.W.2d at 299 (refusing to address a legal question because one of three requirements of a justi-ciable controversy was unsatisfied).
First, no one is asserting a legally cognizable interest on appeal. Vogel’s only interest in the appeal is his dissatisfaction with what he perceives to be an “awful” rule from a nonprecedential district court opinion. Biglow, for his part, does not articulate any continuing interest in this “dispute,” let alone a legally cognizable one. Even aside from the fact that Tschu-my, whom Biglow ostensibly represents, no longer has any interest in this case, Biglow is not a professional guardian, and he has never asserted that the outcome of this case will have any impact on his legal practice. In fact, at oral argument, Biglow all but acknowledged that the driving force for his legal position on appeal has been taking a position opposite to Vogel, rather than a personal or professional interest in obtaining a particular result. Second, there is insufficient adversity in this case because Tschumy’s estate is paying the legal fees of both sides, and it is not clear why, or to what extent, either side is opposing the other. Third, as stated above, our judgment in this case (as well as that of the court of appeals) is meaningless, other than as an attempt to create precedent. Thus, even though this case presents a legal issue with statewide importance, the Minnesota Constitution requires us to exercise restraint and await a different ease — one with a justiciable controversy — to decide the issue. See St. Paul City Ry. Co. v. City of St. Paul, 259 Minn. 129, 133, 106 N.W.2d 452, 455 (1960) (“[W]e cannot now attempt to render an opinion to cover conditions which may reoccur in the future. Rather, it seems to us that those conditions will have to be faced when the occasions arise.... For us to attempt to pass at this time on [the issue] would be out of place.” (emphasis added)); see also State v. M.D.T., 831 N.W.2d 276, 285 (Minn.2013) (Stras, J., concurring) (“[T]he ‘judicial power’ extends only to the resolution of actual controversies and does not permit us to render advisory opinions, no matter how important the legal question.”).
*760 In fact, in a case involving a request for a declaratory judgment, we emphasized that it is “essential” for courts to confirm that there is a justiciable controversy before rendering a decision on the merits. Seiz v. Citizens Pure Ice Co., 207 Minn. 277, 281, 290 N.W. 802, 804 (1940). In Seiz, the plaintiff sought a declaratory judgment against his employer that a law amending Minnesota’s unemployment-insurance statutes was unconstitutional. See id. at 279-80, 290 N.W. at 803. Even though the Attorney General intervened on the State’s behalf, we held that the case was nonjusticiable because the parties did not have “adverse interests,” the case did not “admit of specific relief,” and the plaintiffs interest was “merely contingent upon the happening of some event in the future.” Id. at 282-84, 290 N.W. at 804-06. We explained our decision as follows:
The controversy must be justiciable in the sense that it involves definite and concrete assertions of right and the contest thereof touching the legal relations of parties having adverse interests in the matter with respect to which the declaration is sought, and must admit of specific relief by a decree or judgment of a specific character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Mere differences of opinion with respect to the rights of parties do not constitute such a controversy.
Id. at 281, 290 N.W. at 804 (emphasis added). It is almost as if we wrote Seiz with the specific circumstances of this case in mind.
As in Seiz, the parties here — Vogel and Biglow — do not really have “adverse interests.” Id. at 281, 290 N.W. at 804; see also In re Riddlemoser, 317 Md. 496, 564 A.2d 812, 816-17 (1989) (dismissing an appeal involving the question of whether guardians have the power to order the cessation of life-sustaining medical treatment because the ward had died and there was insufficient adversity among the parties, which had included the guardian and counsel for the ward). Both claim to be representing Tschumy’s interest, but neither Tschumy nor his estate has any interest in the legal question before the court, and indeed, no one really has the slightest clue what Tschumy might have thought about the abstract legal question of whether a guardian may unilaterally order the discontinuation of a ward’s life-support systems.[2] Nor does the controversy “admit of specific relief by a decree or judgment of a specific character.” Seiz, 207 Minn, at 281, 290 N.W. at 804. Neither the plurality nor the parties explain how our decision in this case could do anything except announce an abstract legal rule, which by itself cannot be “specific relief.” Finally, this case squarely fits within Seiz’s warning that we should be wary of cases that turn on “[m]ere differences of *761 opinion with respect to the rights of parties” because such cases do hot “constitute ... a controversy.”[3] Id. at 281, 290 N.W. at 804. Based on Seiz, therefore, the court should dismiss this case “for want of jurisdiction of the subject matter....” Id.
The requirement of a justiciable controversy is not an excuse for courts to decline to decide tough or important questions. Rather, it is a constitutional constraint on the authority of the judiciary. The Minnesota Constitution divides the powers of the government into three “distinct departments,” and provides that “[n]o person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.” Minn. Const. Art. Ill, § 1. The judiciaiy is limited to “judicial act[s].” Application of the Senate, 10 Minn, at 81 (Gil. at 58). The resolution of an abstract legal question outside of the context of a justiciable controversy is not a “judicial act,” it is a legislative act, and I cannot subscribe to the plurality’s approach because it requires us to act as legislators, not as judges.
The district court recognized the policy-making nature of its actions when it deeid-ed this case. In its May 2012 order, the district court said that “[t]he issue of who has the power to order the removal of life support — the Court or the guardian” is one that “has escaped the attention of our [Legislature.” In its October 2012 order, the court expressed the hope that “the Legislature or higher judicial authority will definitively determine who can make end-of-life decisions, and how those decisions must be made.” The court pointed out that the legal question was “of great significance to thousands of wards, guardians, and family members throughout Minnesota” and said that “[t]he Court would not serve the people of Minnesota well if it danced around the issue and left the power and process of death as uncertain as it is now.”
Consistent with its self-appointed task of filling in the gaps left by the Legislature, the district court took testimony from a professional guardian, Stephen Grisham, about the training of guardians with respect to end-of-life care and about whether guardians can be trusted in a typical case — not in this specific case — to make end-of-life decisions for their wards. Such testimony would be entirely appropriate at a legislative hearing about the *762 guardianship statutes, but it is out of place at a judicial hearing on whether to authorize the withdrawal of life support from a single ward — especially when all parties agreed that the removal of life support was appropriate. Just five months later, the district court issued an order, itself an advisory opinion, in which it concluded that “[t]he lack of training and consistency among most guardians is precisely the reason to involve the judicial system — to provide experienced and impartial examination and evaluation of termination decisions.” The court’s conclusion is precisely the type of pure policy decision we generally leave to the Legislature. See Axel-berg v. Comm’r of Pub. Safety, 848 N.W.2d 206, 213 (Minn.2014) (“In short, if the Implied Consent Law needs revision in order to make it embody a more sound public policy, the Legislature, not the judiciary, must be the reviser.”).
It should be clear at this point, as the district court’s language in its second order implicitly acknowledged, that this case no longer involves any real controversy between the parties. It is now a manufactured controversy involving an abstract and hypothetical legal question that the parties, if the question is still sufficiently important to them, should direct to the Legislature. Accordingly, rather than adopting an approach that would expand our own power at the Legislature’s expense, I would instead follow precedent and dismiss the appeal in this case for lack of subject matter jurisdiction.
B.
Not only does this case fail to satisfy our general definition of a justiciable controversy, which alone warrants dismissal,[4] it is also moot. A case becomes moot when “the court is unable to grant effectual relief.” In re Schmidt, 443 N.W.2d 824, 826 (Minn.1989). Mootness has been described “ ‘as the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).’ ” Kahn v. Griffin, 701 N.W.2d 815, 821 (Minn.2005) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)).
The plurality concludes, and I agree, that this case is moot because we are unable to grant effective relief to anyone, *763 much less Tschumy. Nevertheless, the plurality would decide the case anyway because, in its view, it “presents an important public issue of statewide significance” and it is “functionally justiciable.”
The plurality correctly observes that we have recognized certain exceptions to the mootness doctrine. It is also true that we have described mootness as “a flexible discretionary doctrine, not a mechanical rule that is invoked automatically whenever the underlying dispute between the particular parties is settled or otherwise resolved.” State v. Rud, 359 N.W.2d 573, 576 (Minn. 1984). But in arguing that we should decide this particular case, the plurality stretches the mootness doctrine beyond mere flexibility, into the realm of infinite elasticity.
An animating principle underlying the various exceptions to the mootness doctrine is a recognition that a case may become moot at such an “advanced stage” that it may prove “more wasteful than frugal” to dismiss it. Friends of the Earth, 528 U.S. at 191-92, 120 S.Ct. 693; see also State ex reí Sviggum v. Hanson, 732 N.W.2d 312, 322 (Minn.App.2007) (discussing the exceptions to the mootness doctrine, including the capable-of-repetition-yet-evading-review exception). Thus, when the Supreme Court considers whether to recognize a new exception, it usually examines whether the new exception will promote judicial efficiency. See Honig v. Doe, 484 U.S. 305, 331, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (Rehnquist, C.J., concurring) (noting that “while an unwillingness to decide moot cases may be connected to the case or controversy requirement of Art. Ill, it is an attenuated connection that may be overridden where there are strong reasons to override it”); see also Friends of the Earth, 528 U.S. at 191-92, 120 S.Ct. 693 (discussing the voluntary-cessation exception to the mootness doctrine); S. Pac. Terminal Co. v. Interstate Commerce Comm’n, 219 U.S. 498, 514-17, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (discussing the capable-of-repetition-yet-evading-review exception to the mootness doctrine). In Honig, for example, Chief Justice Rehnquist proposed a new exception to the mootness doctrine for cases that become moot after the Supreme Court has granted certiorari or noted probable jurisdiction. See 484 U.S. at 331-32, 108 S.Ct. 592 (Rehnquist, C.J., concurring).
This case did not become moot at such an “advanced stage” that a dismissal would prove “more wasteful than frugal.” In fact, it became moot just 16 days after the Hospital filed its motion, when the district court granted the Hospital’s motion to discontinue treatment. At that point, there was nothing else to decide. In contrast, in none of the cases cited by the plurality to support its view that the case is functionally justiciable did the case become moot before the district court entered final judgment. See, e.g., Jasper v. Comm’r of Pub. Safety, 642 N.W.2d 435 (Minn.2002) (deciding an appeal even though the Commissioner of Public Safety promulgated a new regulation after this court had granted review of the case); Rud, 359 N.W.2d at 576 (applying an exception to the mootness doctrine when the State dismissed the charges against the defendant after this court had granted review of the case); see also State v. Matthews, 779 N.W.2d 543, 548 (Minn.2010) (reviewing a jury instruction on a crime of which the defendant was found guilty, even though the issue arguably became moot after the district court convicted him of another crime). In other words, the plurality does not cite a single case in which an appellate court was required to write an advisory opinion in review of an advisory opinion.
The distinction is significant. The longer a case has been moot, the further divorced it becomes from the personal inter *764 ests that animated the controversy in the first place, and the more it resembles a “mere difference[] of opinion,” Seiz, 207 Minn, at 281, 290 N.W. at 804. Indeed,, there is not much daylight between the plurality’s conclusion in this case — that a controversy that has long been moot is justiciable — from a conclusion that a justi-ciable controversy is no longer necessary at all.[5]
It is true, as the plurality notes, that courts in other jurisdictions have decided controversies that are similar to this one. But these foreign cases were all decided under different constitutions — some of which permit advisory opinions in certain circumstances — and in the face of different facts — none of which required an appellate court to review what was itself an advisory opinion. Most importantly, these other courts have adopted an approach that is inconsistent with this court’s interpretation of Article III, Section 1 of the Minnesota Constitution.
C.
This appeal is nonjusticiable for yet a third reason: Vogel lacked standing to appeal the district court’s second order. See In re Custody of D.T.R., 796 N.W.2d 509, 512 (Minn.2011) (noting that a party must “have standing before a court can exercise jurisdiction”). Tschumy died in May 2012, so by the time the district court issued its second order in October 2012, Vogel was no longer Tschumy’s guardian. Minn.Stat. § 524.5-317 (2012) (“A guardianship terminates upon the death of the ward or upon order of the court.” (emphasis added)). Vogel left no doubt about that fact when he successfully petitioned the district court for an order confirming his termination as guardian just days after Tschumy’s death. Nevertheless, after the district court issued the order now under review, it ordered that Vogel “shall remain on the case pending ... appeal,” and based on that order, the court of appeals permitted Vogel — who no longer represented Tschumy in any way — to appeal the district court’s order. However, by the time the district court issued its second order, Vogel no longer had standing to file an appeal because he was no longer a party to the litigation, a fact that the district court could not simply change by fíat.
Standing must exist at all stages of the litigation, “including when a plaintiff brings a cause of action and when a party appeals a decision.” D.T.R., 796 N.W.2d at 512. A party can establish standing in two ways: by demonstrating “either [that] the [party] has suffered some ‘injury-in-fact’ or [that] the [party] is the beneficiary of some legislative enactment granting standing.” Enright v. Lehmann, 735 N.W.2d 326, 329 (Minn.2007).
With respect to statutory standing, Vo-gel cannot identify any statute, nor am I aware of any, that grants a former guardian the right to appeal from the adjudication of a legal question related to a former ward. To be sure, a guardian — that is, a *765 non-terminated guardiaii — has certain rights as an “interested person” in guardianship proceedings. See Minn.Stat. § 524.5-102, subd. 7(ii) (2Q12). Blit nothing in the guardianship statutes allows a guardian, former or otherwise, to appeal an order in the guardian’s personal capacity or permits a former guardian to take any action on behalf of a ward. See Minn. Stat. § 524.5-414(a) (2012) (limiting the authority to “file a petition in the appointing court” to only “interested person[s]” and “protected person[s],” neither of which includes a former guardian); see also MinmStat. § 524.5-313(b) (2012) (stating that a guardian possesses “only those powers necessary to provide for the demonstrated needs of the ward”).
The second basis for standing requires a party to have suffered an injüry-in-fact— that is, “a concrete and particularized invasion of a legally protected Merest.” D.T.R., 796 N.W.2d at 513 (citation omitted) (internal quotation marks omitted); see also Enright, 735 N.W.2d at 329 (defining an injury-in-fact). “That a party must be aggrieved in order to appeal remains fundamental....” D.T.R., 796 N.W.2d at 513 (citation omitted) (internal quotation marks omitted). For a party to have a right to an appeal, “[t]he injury to the right impacted by the adjudication must be immediate, and not a ‘possible, remote consequence, or mere possibility arising from some unknown or future contingency.’ ” Id. (emphasis added) (qüoting In re Trust in Estate of Everett, 263 Minn. 398, 401, 116 N.W.2d 601, 603 (1962)). Most importantly, unlike mootness, we have never held that the requirement of standing can be set aside if the case is functionally justiciable and presents a question of statewide importance. Cf Friends of the Earth, 528 U.S. at 191, 120 S.Ct. 693 (noting that “[sjtanding admits of no similar exception” when examining the capable-of-repetition-yet-evading-review exception to mootness).
Once the district court authorized the withdrawal of life-sustaMng medical treatment in May 2012, Vogel received the only relief of interest to Tschumy. At that time, Tschumy no longer had a legally cognizable injury and it follows that, in his representational capacity, neither did Vo-gel. While it is possible that Vogel may one day sustain an injury in fact if he is unable to make a unilateral life-ending decision for some future ward to which he may be assigned, any such injury is, at most, only a “‘possible, remote consequence, or mere possibility arising from some unknown or future contingency.’ ” See D.T.R., 796 N.W.2d at 513. That type of speculative injury, as we have long held, is insufficient to confer standing on Vogel because it does not constitute a concrete and particularized invasion of any legally protected right.[6] Vogel lacked standing in the court of appeals, and he likewise lacks it here.
III.
The scope of a guardian’s authority to make end-of-life decisions for a ward is, without question, an exceedingly important question. But it is a bedrock constitutional principle that Minnesota courts lack the authority to decide any legal question, even an exceedingly important one, in the absence of a justiciable controversy. When a justiciable controversy is missing, as it is here, and as it was in the court of *766 appeals, it is our constitutional duty to dismiss the case. In the absence of a justiciable controversy, it is the Legislature’s job, not ours, to clarify the scope of a guardian’s authority in making end-of-life decisions for a ward. To reach any other conclusion would violate Article III, Section 1 of the Minnesota Constitution. For these reasons, I would vacate the decision of the court of appeals and remand with instructions to dismiss the appeal for lack of subject matter jurisdiction.

. There is no question, as the plurality states, that the judiciary’s job includes interpreting statutes. However, we do not engage in statutory interpretation for its own sake. Rather, we interpret statutes only in the context of a justiciable controversy in order to provide meaningful relief to one or more of the parties. When we do so for any other reason, we cross the boundary from performing a judicial duty- — that is, resolving disputes — into the realm of performing a legislative duty — that is, resolving policy questions in the abstract. Such an observation is hardly novel. The Supreme Court of the United States has observed that ruling in the absence of a justicia-ble controversy ”create[s] the potential for abuse of the judicial process, distort[s] the role of the Judiciary in its relationship to the Executive and the Legislature and open[s] the Judiciary to an arguable charge of providing government by injunction.” Schlesinger v. Reservists Comm, to Stop the War, 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (internal quotation marks omitted); see also Summers v. Earth Island Inst., 555 U.S. 488, 492, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (stating that "courts have no charter to review and revise legislative and executive *757 action” in the absence of a justiciable controversy).

. The plurality is correct that guardianship cases do "not contemplate adversity in the same way as a typical contested case.” See, e.g., In re Guardianship of Spangler, 126 Ohio St.3d 339, 933 N.E.2d 1067, 1074 (2010) ("Guardianship proceedings ... are not adversarial but rather are in rem proceedings involving only the probate court and the ward."). Even so, parties who seek to appeal an order in a guardianship case still "must either have an interest adverse to the ward’s or have otherwise been aggrieved in some manner by the order." In re Guardianship of Santrucek, 120 Ohio St.3d 67, 896 N.E.2d 683, 685 (2008). What is missing in this case is the possibility that a court could order meaningful relief in favor of either the ward or the ward’s estate. The parties in this case all but concede — as they must — that the outcome of this appeal will have no effect on Tschumy or his estate. Thus, even under the reasoning of the cases relied upon by the plurality, adversity remains critical to ensure that the reason for the litigation remains the interests of the ward and not the personal interests of the parties.

. The plurality concludes that this cáse is justiciable based on its view that a disagreement between the parties over (he legal issues in this case is not only necessary, but is also sufficient to present a justiciable controversy. For example, in explaining why the district court’s second order was nof an advisory opinion, the plurality stresses that "the parties in this case were adverse at the district court, as they are here, with respect to the statutory interpretation question.” The plurality makes the same point in distinguishing Seiz, but in doing so, fails to accord significance to the actual words we used in our opinion. As Seiz makes cleat, a "mere difference[ ] of opinion with respect to the rights of the parties do[es] not constitute ... a [justiciable] controversy.” Seiz, 207 Minn, at 281, 290 N.W. at 804 (stating that a justiciable controversy "must admit of specific relief”); see also North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (stating that the very definition of an advisory opinion is when the parties call on a court “to decide questions that cannot affect the rights of the litigants before them”). Accordingly, whenever we have had the opportunity to do so, we have roundly rejected the proposition that a disagreement about the proper resolution of a legal issue, standing alone, can present a justiciable controversy. See, e.g., St. Paul Area Chamber of Commerce v. Marzitelli, 258 N.W.2d 585, 587-90 (Minn.1977); Marlc-■wardt v. State, 254 N.W.2d 371, 374 (Minn. 1977); Beatty v. Winona Hous. and Redev. Auth., Ill Minn. 76, 83-86, 151 N.W.2d 584, 588-89 (1967); Seiz, 207 Minn, at 281, 290 N.W. at 804.

. The term “justiciable” refers to a case or controversy that is "capable of being disposed of judicially” or one that is "properly brought before a court of justice.” Black’s Law Dictionary 997 (10th ed.2014). The central concept of "justiciability” is then divided into "more specific categories of justiciability— advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions.” 13 Charles Alan Wright et al., Federal Practice and Procedure § 3529, at 612 (3d ed.2008) (citing cases); see also McCamey v. Ford Motor Co., 657 F.2d 230, 233 (8th Cir.1981) (describing "standing as a part of the concept of justiciability which includes the questions of advisory opinions, mootness and ripeness”).
When we announced the three fundamental requirements for a justiciable controversy in Onvoy, we provided a general definition that every case must satisfy. For example, in Schowalter, we refused to decide one of the issues presented in the case because there was insufficient adversity between the parties, and we did not refer to any of the specific justiciability doctrines — such as mootness, ripeness, or standing — in reaching our conclusion. 822 N.W.2d at 299. Applying Schowalter’s analysis here, this case is nonjus-ticiable because it does not meet the definition of a justiciable controversy, regardless of whether it satisfies the requirements of one of the more specific justiciability doctrines such as mootness. By examining only the question of mootness, the plurality’s analysis ignores an entire line of cases beginning with Application of the Senate and culminating with our most recent decision in Schowalter.

. If the absence of a justiciable controversy does not preclude us from deciding this case — -in which there was no live controversy when the district court issued the order now under review — it is hard to imagine a case that the plurality would dismiss. Perhaps the plurality would dismiss an abstract controversy based on nothing more than a straightforward philosophical disagreement between two parties, but given that this case has evolved into precisely such a disagreement between Vogel and Biglow, such a possibility provides little comfort. There is also little comfort in the fact that the exception invoked by the plurality requires the case to present a question of statewide importance. After all, virtually every case on our discretionary docket presents a question of statewide importance. See Minn. R.App. P. 117, subd. 2 (setting forth the criteria on which we should grant review, including whether "the question presented is an important one upon which the Supreme Court should rule”).

. The plurality’s approach, extended to its logical end, would provide standing to an attorney who is dissatisfied with a decision received by a client, even if the client chooses not to appeal the decisipn. If the requirement of standing is to be stretched so far that it arguably becomes nothing more than a formality, the change should come by means of a constitutional amendment, not through a decision of this court.